LEANNE JOHNSON, Justice
This is an accelerated appeal from the trial court's order overruling the defendants' objections to plaintiff's expert reports and denying a motion to dismiss plaintiff's health care liability claim. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West Supp. 2016); see also itation index="1" url="https://cite.case.law/citations/?q=Tex.%20Code%20Ann.%20%C2%A7%2074.351">id. § 51.014(a)(9) (West Supp. 2016).[1] Defendants Christus Health Southeast Texas d/b/a Christus Hospital-St. Elizabeth (Christus) and HealthSouth Rehabilitation Hospital of Beaumont, LLC d/b/a HealthSouth Rehabilitation Center-Beaumont (HealthSouth) (collectively Appellants) timely filed this appeal complaining that the trial court erred in overruling their objections and in failing to dismiss the health care liability claim of plaintiff, Sue Abshire (Abshire, Plaintiff, or Appellee). See Tex. Civ. Prac. & Rem. Code Ann. § 74.351 ; see also itation index="3" url="https://cite.case.law/citations/?q=Tex.%20Code%20Ann.%20%C2%A7%2074.351">id. § 51.014(a)(9). We granted the parties' request for argument, and we now reverse and remand.
BACKGROUND
Allegations in Original Petition
On February 2, 2015, Abshire filed an Original Petition and Request for Disclosure (Original Petition) against defendants Christus, HealthSouth, Frank Fasullo, M.D., and Sidney Marchand, M.D., wherein she asserted a claim of negligence based on care or treatment that she received between November 19, 2012, and December 6, 2012. Abshire alleged that on November 19, 2012, Abshire went to Christus with sharp pain in her chest and back, and she was admitted to the hospital by Dr. Fasullo. Abshire was then discharged home with pain medication and that the *197 medical history taken at Christus "fail[ed] to note her long standing diagnosis of osteogenesis imperfecta [ ]" (OI). According to Abshire, "[o]steogenesis imperfecta predisposes the patient to fractures." Abshire returned to Christus on November 22, 2012, and she was admitted for chest pain and breathing difficulty, and then discharged home. Abshire contends that on November 30, 2012, Abshire returned to Christus where Dr. Marchand admitted her for worsening symptoms. According to Abshire, Abshire's medical records contain a note that she has a twenty-year history of treatment for OI but Abshire contends that her spine was not evaluated or stabilized during the November 30th hospital visit. According to the Original Petition, Abshire was transferred to HealthSouth on December 3, 2012, where she was "started [ ] on a physical therapy program without recognizing the fragility of her condition." Abshire alleges that on December 6, 2012, Abshire was diagnosed with a compression fracture and underwent emergency surgery, but she emerged from surgery as a paraplegic.
In her petition, Abshire made the following allegations as to Christus:
Specifically, the health care professionals at Christus Hospital St. Elizabeth Hospital who attended the patient failed to recognize the signs and symptoms of a spinal compression fracture resulting in a delay in treatment which caused Ms. Abshire's paraplegia. They also missed the history of osteogenesis imperfecta that predisposes one to fractures.
With respect to her claims against Dr. Fasullo and Dr. Marchand, who are not parties to this appeal, Abshire pleaded the following:
Specifically Doctors Fasullo and Marchand failed to conduct a thorough medical history, examine the patient's medical records, evaluate the patient properly for her spinal symptoms, failed [to] recognize the implications of osteogenesis imperfecta, and failed to stabilize her spine.
As to her claim against HealthSouth, Abshire pleaded as follows:
The health care professionals at Healthsouth Rehabilitation Hospital of Beaumont failed to evaluate the patient properly for her spinal symptoms, failed to consult the medical records and recognize the implications of osteogenesis imperfecta, failed to stabilize her spine and, started her on a physical therapy program without recognizing the fragility of her condition.
With respect to all defendants, Abshire made the following general allegations:
Defendants failed to exercise the requisite degree of skill and care ordinarily exercised by any careful, prudent physician, resident, intern, representative, employee or agent in the same or similar circumstances, and thereby was negligent.
Each of the acts and/or omissions of the Defendants, as alleged herein, but not necessarily limited thereto, singularly or in combination with others, constituted negligence and proximately caused the resulting [ ] injuries and damages suffered by Plaintiff.
....
As a result of these actions, singular or in combination, Plaintiff Sue Abshire suffered severe personal injuries and damages for which she now sues.
On February 25, 2015, HealthSouth filed an answer and denied the allegations. On February 28, 2015, Christus filed an answer *198 and also denied the allegations.[2]
Dr. Rushing's June Report
On or about June 23, 2015, Abshire produced a report and curriculum vitae (CV) from Lige B. Rushing, M.D. (Dr. Rushing or Rushing). In the June Report, Dr. Rushing stated that he received his M.D. degree from Baylor University College of Medicine, and interned at Harris Hospital in Fort Worth, Texas. Rushing also has a Master of Science degree in medicine from the University of Minnesota, and he received "specialty training in internal medicine and rheumatology" at the Mayo Clinic in Rochester, Minnesota. According to the June Report and CV, Dr. Rushing is board-certified in internal medicine, rheumatology, and geriatrics, and he continues to actively practice these specialties. Rushing is on the attending staff of the Presbyterian Hospital in Dallas, Texas. Rushing's June Report included the following statement:
In the regular course of my medical practice I have [had] occasion to diagnose and treat patients with osteogenesis imperfect[a]. This is a rare genetic condition, however, during the course of my career I have provided primary medical care to two patients with this condition and based on my training as a rheumatologist, I am trained to recognize, diagnose, and treat patients with this condition.
In summarizing the records of Abshire's treatment that he reviewed, Dr. Rushing stated in his June Report that, although Abshire was treated at Christus on November 19, 20, 22, 23, and 29 of 2012, her history of OI was noted in the records only on November 22 and 23. According to Rushing, Abshire presented at Christus on December 3, 2012, "complaining of pain in her back and stated that she wished to go to a rehabilitation center because she could not walk at home and needed help." Rushing indicated in his June Report that Abshire was transferred to HealthSouth on December 3, 2012, where Dr. Smith evaluated her, and the following day Abshire "complained of electrical voltage shooting down her shoulders, back, and legs" when she was sitting or when she was moved, and she also reported loss of bowel and bladder control.[3] According to Rushing, Dr. Smith's "plan was to have cervical, thoracic, and lumbar spine non contrast MRI studies performed." Dr. Rushing stated that "instead of stabilizing Ms. Abshire's fragile spine, it was recommended that she continue a 3 hour per day, 5+ day per week therapy program starting immediately." Rushing's June Report also noted Abshire's records reflect that on November 29, December 1, and December 2, she had a history of "psychiatric disturbances[ ]" and schizophrenia and that she received a diagnosis of schizophrenia at Christus on November 30 and on December 2. Dr. Rushing wrote that it appeared that Abshire had a psychiatric disorder "which could be a somatization type disorder," but that acute neurologic injury should have also been considered as accounting for Abshire's symptoms.
Dr. Rushing's June Report stated that Abshire was transferred back to Christus on December 5, 2012, where a physician "medically cleared" her and notified Dr. *199 Smith that Abshire would be returning to HealthSouth. Dr. Smith then ordered Abshire to be routed to Baptist Beaumont Hospital Emergency Room (Baptist Hospital). An MRI was performed at Baptist Hospital, Abshire was then transferred to Memorial Hermann Hospital in Houston, and she was diagnosed with "a Compression Fracture of T-5 with loss of motor function to lower extremities."
According to Rushing's June Report, the standard of care required Christus to: (1) evaluate the cause of Abshire's pain, (2) examine her back for musculoskeletal problems, (3) consider her relevant prior medical history, (4) recognize signs and symptoms indicating a compromise of the musculoskeletal system in Abshire's neck, shoulders, and back, and (5) institute early stabilization of the spine prior to the establishment of paraplegia. The standard of care for HealthSouth required it to "properly evaluate and assess Ms. Abshire before admission and prior to physical therapy."
Dr. Rushing opined that Christus breached the applicable standard of care in the following ways: (1) failure to evaluate the cause of Abshire's chest, back, and neck pain, (2) failure to examine Abshire's back for musculoskeletal problems, (3) failure to consider Abshire's prior medical history and her "longstanding" diagnosis of OI, (4) failure to recognize the signs and symptoms indicating a compromise of the musculoskeletal system in the neck, shoulders, and back, and (5) failure to institute early stabilization of the spine prior to the development of paraplegia. Dr. Rushing addressed causation as to Christus as follows:
The harm/injury that resulted from the substandard care provided by the Defendant Christus ... was the exacerbation of an undiagnosed vertebral fracture that lead [sic] to a spinal cord injury resulting in paraplegia and bowel and bladder incontinence. Had Defendant Christus ... followed the Standard of Care for patients with OI, Ms. Abshire in medical probability would not have developed paraplegia and bowel and bladder incontinence.
According to Rushing, appropriate assessment would have detected the vertebral fracture and spinal cord injury and Christus's breach of the standard of care "in medical probability caused the eventual loss of bladder and bowel function and paralysis in both legs."
Dr. Rushing's June Report concluded that HealthSouth should have but did not properly evaluate and assess Abshire before admission and before beginning physical therapy, that HealthSouth's screener failed to properly assess Abshire, and that HealthSouth "accepted a patient they never should have accepted." According to Rushing:
The harm/injury that resulted from the substandard care provided by the Defendant [HealthSouth] ... was the exacerbation of an undiagnosed vertebral fracture and spinal cord injury. Had Defendant [HealthSouth] ... followed the Standard of Care for patients with OI and a spinal cord injury, Ms. Abshire in medical probability would not have developed paraplegia and bowel and bladder incontinence.
In his report, Dr. Rushing also included the following description of OI and certain symptoms of OI that he concluded Abshire had manifested:
Osteogenesis imperfecta (OI) is an inherited connective tissue disorder with many phenotypic presentations. It is often called "brittle bone disease." Severely affected patients suffer multiple fractures with minimal or no trauma, and infants with the worst form of OI die in the perinatal period. Mild forms of OI
*200 may manifest with only premature osteoporosis or severe postmenopausal bone mineral loss.
Osteogenesis imperfecta is a disease of the mesodermal tissues with abnormal or deficient collagen that has been shown in bone, skin, sclera, and dentin. The so-called diagnostic triad of blue sclera, dentinogenesis imperfecta, and generalized osteoporosis in a patient with multiple fractures or bowing of the long bones usually is used clinically. Osteogenesis imperfecta congenita is characterized at birth by multiple fractures, bowing of the long bones, short extremities, and generalized osteoporosis.
People with this condition have bones that fracture easily, loose joints and muscle weakness, blue sclera, tendency toward spinal curvature, and bone deformity.
Ms. Abshire had the common signs and symptoms of Osteogenesis Imperfecta including bi-lateral ankle deformity which was most likely a result of the bowing of the long bones in her legs, and blue sclera.
There is no cure for osteogenesis imperfecta. Treatment involves supportive therapy to decrease the number of fractures and disabilities, help with independent living and maintain overall health.
HealthSouth's Objections to Dr. Rushing's June Report
On July 14, 2015, HealthSouth filed objections to Dr. Rushing's June Report and a motion to dismiss. According to HealthSouth, Dr. Rushing's report was conclusory as to the standard of care and breach, it failed to articulate a standard of care for a rehabilitation hospital and its nonphysician healthcare providers (including admissions, physical therapists, and nurses), and it failed to articulate what HealthSouth's personnel should have done differently. HealthSouth argued that the report was conclusory as to causation, and that it did not adequately link the alleged deviations of the standard of care by HealthSouth to Abshire's injuries. Finally, HealthSouth argued that Dr. Rushing did not show he was qualified to address the standard of care for a rehabilitation hospital and its non-physician workers, to provide an opinion as to the causation of a spinal injury, or to opine as to how HealthSouth's alleged deviation from the applicable standard of care caused or exacerbated Abshire's spinal injury.
Christus's Objections to Dr. Rushing's June Report
On July 14, 2015, Christus filed objections to Dr. Rushing's June Report. Christus argued that the report "fails to adequately establish the standard(s) of care applicable to Defendant, the manner in which Defendant breached any alleged standard(s) of care and/or the causal link between Defendant's alleged misconduct and the injuries of Ms. Abshire."
On September 9, 2015, Christus separately filed a motion to dismiss. Therein, Christus argued that (1) because only a physician may diagnose and treat, Christus cannot be liable for failures regarding diagnosis or treatment, (2) Dr. Rushing's report failed "to state in factual terms what [Christus] did or failed to do that led to [Abshire's] injuries and how and why this conduct or failure to act resulted in the injuries[,]" and (3) Dr. Rushing had not shown he was qualified to offer opinions in neurology, neurosurgery or spinal cord injuries, "which is exactly what he offers in his report."
Plaintiff's Response to the Objections to the June Report
On October 12, 2015, Abshire filed a response to HealthSouth's objections and motion to dismiss. Therein, Abshire argued *201 that Rushing's report was adequate. Abshire argued that Dr. Rushing's opinion as to causation was not conclusory and that it was supported by facts.
On October 12, 2015, Plaintiff also filed a response to Christus's objections and motion to dismiss. In her response to Christus, Abshire argued that Dr. Rushing had stated in his report that the hospital staff failed to note Abshire's history of OI, which was "a clear indication of failure to properly document on the part of the hospital staff." Abshire also asserted that Rushing's report adequately addressed causation and explained that her complaints should have been investigated by means of CT or MRI imaging. Abshire maintained that Dr. Rushing was qualified to render a Chapter 74 expert report and that "[n]ot one breach of the standard of care alleged by plaintiff implicates the specialties of neurology, neurosurgery, or spinal cord injury care." Abshire also noted that the objections Christus included in its motion to dismiss (filed on September 9) were untimely and, if the trial court found the report insufficient, Abshire should be granted a thirty-day extension to cure any deficiency.[4]
Trial Court's October 2015 Ruling Order
On October 16, 2015, the trial court held a hearing on the objections to Dr. Rushing's June Report, during which the parties reurged their arguments but presented no additional evidence. On October 26, 2015, the trial court issued a letter with its findings regarding Dr. Rushing's June Report. The court found that Dr. Rushing's report was a good faith effort to comply with Chapter 74 but that the June Report did not comply with the requirements of the statute in the following respects: (1) Dr. Rushing's report failed to identify the source of his knowledge concerning the standard of care for Christus, HealthSouth, and/or the nurses or other hospital personnel at Christus or HealthSouth; (2) Dr. Rushing's report failed to identify a specific standard of care as to each defendant; (3) Dr. Rushing's report failed to identify the specific methods by which Abshire's back would have been stabilized; (4) Dr. Rushing's report failed to identify the "appropriate treatment" that should have been undertaken and how it would have prevented Abshire's paraplegia ; and (5) Dr. Rushing's report failed to explain how the nurses' failure to chart Abshire's history was a proximate cause of Abshire's injuries. On November 5, 2015, the trial court signed an order sustaining HealthSouth's and Christus's objections to Dr. Rushing's June Report and granting Abshire a thirty-day extension to supplement her expert report.
Report by Nurse Aguirre
Thereafter, Plaintiff produced a report by Nurse Erika Aguirre (Nurse Aguirre or Aguirre) dated November 19, 2015, in which Nurse Aguirre stated that she has a Bachelor's degree and Master's degree in Nursing, is a licensed advance practice nurse, is board-certified as a Clinical Nurse Specialist in Adult Health, and currently works as an adjunct nursing faculty member and clinical instructor. Nurse Aguirre stated that she addressed the standard of care and breach for the nursing staff at Christus. According to Aguirre, the standard of care for Christus required Christus "to document a complete and accurate assessment" including a health history, primary complaint, pain, "diagnose deviations from the expected pattern of physiologic activity[,]" and "communicate *202 pertinent information to the physician and multidisciplinary team members." Nurse Aguirre stated in her report that the nursing staff at Christus breached the applicable standard of care by failing to document a complete and accurate assessment, health history, focused assessment, pain assessment, level of care or transfer, deviations from expected pattern of physiologic activity, communicate with physician and other staff, and by failing to do so timely. Aguirre further stated that Abshire "was not evaluated and treated properly allowing a thoracic compression fracture to be missed thereby causing delay in necessary treatment and preventative care that ultimately led to the permanent paralysis in her lower extremities."
Supplemental Reports by Dr. Rushing
Plaintiff also produced two supplemental reports by Dr. Rushing dated November 23, 2015-one regarding Christus, and the other one regarding HealthSouth. We summarize below the additional or modified allegations from the November 23, 2015 reports (the November Reports).
In his November Report as to Christus, Dr. Rushing stated that he supervised the nursing staff who were on call with him in the ER from 1966 until sometime in the 1980s, and as a result, he is "very familiar with the nursing standard of care for evaluating, charting, and relating critical information to the ER physician." Rushing also stated that he was involved in setting policy for the ER staff at Presbyterian Hospital of Dallas. And Dr. Rushing's report stated that he is qualified to opine as to the standard of care for "the nurses and/or Defendant Christus ...."
In his November Report as to HealthSouth, Dr. Rushing stated that as a board-certified physician in internal medicine, rheumatology, and geriatrics, he often oversees "the rehabilitation of fragile patients with a multitude of injuries, including spinal injuries." Dr. Rushing stated that he is qualified to opine as to the standard of care for "HealthSouth and its staff."
In his November Report as to Christus, Dr. Rushing stated that the standard of care for nurses "is to document a complete and accurate assessment." According to Rushing, "[d]uring multiple admissions the history of osteogenesis imperfecta was missed completely[,]" and Abshire's back pain and related symptoms were "minimalized in the documentation[ ]" on other admissions. Dr. Rushing further stated that "[t]he lack of properly assessing Ms. Abshire's medical history and physical conditions is a breach in the standard of care." According to Dr. Rushing, a lack of information results in delay of proper medical care and impedes physicians from ordering appropriate testing and prescribing proper treatment and preventative care, and
... had the symptomology that Ms. Abshire was experiencing been appropriately linked to the osteogenesis imperfecta diagnosis then the proper course of care would have been to admit the patient to the hospital on absolute bed rest, order imaging studies such as a CT or MRI of her back, then treat the injury to the spine as required by its severity by such methods as bracing through spinal fusion. The goal would be to alleviate pressure on the spine such that the compression fracture does not progress and paraplegia does not occur.
Dr. Rushing also stated in his November Report as to Christus that "[t]he standard of care requires nurses to advocate on behalf of the patient." However, Rushing did not opine as to how or in what manner the nursing staff should have "advocated" for Abshire, or how the failure to be an "advocate" for the patient caused or contributed to Abshire's injury.
*203 According to Dr. Rushing's November Report as to Christus, the harm suffered by Abshire as a result of "substandard care" by Christus was "the exacerbation of an undiagnosed vertebral fracture that lead [sic] to a spinal cord injury resulting in paraplegia and bowel and bladder incontinence." Dr. Rushing stated that the hospital staff's failure to evaluate the cause of Abshire's chest, back, and neck pain "allowed Ms. Abshire's compression fracture to go undetected until it became so sever[e] that she became paralyzed from the [waist] down[,]" the hospital staff "clearly ignored signs and symptoms of spinal injury[,]" and the hospital staff's failure to investigate "allowed the spinal injury to progress to the point of paraplegia." According to Dr. Rushing, the hospital staff's failure to consider Abshire's "relevant medical history" led to "a delay in treatment of Ms. Abshire's compression fracture which in medical probability lead [sic] to paralysis." Dr. Rushing stated that the hospital staff failed to recognize signs and symptoms that indicated a compromise of the musculoskeletal system and that led to a delay in the diagnosis and treatment of the compression fracture, the "[f]ailure to evaluate and detect the spinal cord injury in medical probability caused loss of bladder and bowel function and caused paralysis in both legs[ ]", and the "[f]ailure by the hospital staff to institute early stabilization of Ms. Abshire's spine ... [led] to exacerbation of the compression fracture and the development of paraplegia." Finally, Dr. Rushing concluded that the breaches of care constitute negligence that "was, in reasonable medical probability, a proximate cause of the resultant paralysis suffered by Ms. Abshire."
In his November Report regarding HealthSouth, Dr. Rushing stated that the relevant standard of care required HealthSouth "to properly evaluate and assess Ms. Abshire before admission." Dr. Rushing stated that HealthSouth "accepted a patient they never should have accepted[,]" that Abshire was enrolled in a physical therapy program despite being unable to support her own body weight, and that "[n]o one explored the cause of her continued back pain or increasing loss of lower body function." Dr. Rushing included the following:
Had the proper testing been performed prior to admission to Healthsouth, the damage to Ms. Abshire's spine could have been minimalized. Instead, the patient was admitted to Healthsouth for a physical therapy program that would only exacerbate her spinal cord injury. Proper diagnostic testing would have revealed the injury and allowed not only a proper diagnosis to be made but a proper treatment plan, including stabilization of the patient's spine in order to prevent further damage, to be instituted. Proper stabilization and treatment of the fracture could have prevented further damage, and depending on the level of injury discovered, some of the damage may have been reversible. The failure of Healthsouth to properly assess the physical condition and needs of Ms. Abshire caused continued delay in the treatment of her spinal fracture and the continued worsening of her paralysis and other symptoms.
....
The harm/injury that resulted from the substandard care provided by [HealthSouth] was the exacerbation of an undiagnosed vertebral fracture and spinal cord injury. Had Defendant [HealthSouth] followed the Standard of Care for patients with OI and a spinal cord injury, Ms. Abshire in medical probability would not have developed paraplegia and bowel and bladder incontinence.
*204 Dr. Rushing also added the following statement regarding compression fractures to both of his November Reports: "A compression fracture is a collapse of the vertebra. This weakening is commonly seen in patients with osteoporosis or osteogenesis imperfecta. In severe cases of osteoporosis, coughing or sneezing can ca[u]se compression fractures."
Objections filed by Christus to the November Report
On December 7, 2015, Christus filed its objections to Abshire's supplemental expert reports and a motion to dismiss. Therein, Christus argued that the supplemental reports failed to meet the requirements of section 74.351 and they failed to cure the deficiencies previously noted by the trial court.
Regarding standard of care and breach, Christus argued that Rushing's supplemental report and Aguirre's report failed to identify what the nurses should have done differently. As to Rushing's supplemental report, Christus argued that Rushing did not describe what the standard of care for nurses is with respect to assessing and documenting back pain and related symptoms, and he failed to explain what nurses should look for and how they should describe their observations in a patient's record. According to Christus, Dr. Rushing's assertion that the nurses failed to note Abshire's history of OI is "a conclusion about breach" and is not a statement of what should have been done or about the standard of care. Christus argued that Dr. Rushing's opinion that the staff minimalized Abshire's back pain is unsupported and that "[h]is report is utterly devoid of any fact that indicates that Plaintiff's pain was actually worse than reported" by the nurses at Christus. As to Aguirre's report, Christus contended that Aguirre did not explain how the nurses should have known of Abshire's history of OI in order to include it in her chart.
As to causation, Christus argued that Dr. Rushing failed to show how anything the nurses did or did not do would have changed Abshire's outcome. Christus explained that, although Abshire's history of OI was not noted on November 19, it was noted on November 22 and again on November 23. According to Christus, "[i]f the ER doctors allegedly did not properly treat Plaintiff's condition when they knew about it on November 22 or 23, Dr. Rushing does not explain how things would have been different if the nurses had noted Plaintiff's history of OI" on other dates. Christus contended that Dr. Rushing's causation opinions implicate the diagnosis and treatment of illness, which only physicians may do, and therefore, such causation opinions "are clearly directed at the ER physicians and not the nursing staff." Christus argued that Rushing's supplemental report did not refer to or incorporate by reference Aguirre's report, and because a nurse cannot give an opinion on causation, Rushing's supplemental report did not provide "a causal link between any alleged breach in the standard of care identified by Nurse Aguirre to Plaintiff's injuries[.]"
Christus filed a reply in support of its objections on January 6, 2016, arguing in relevant part as follows:
Most of Dr. Rushing's causation discussion is focused on the ER physicians who treated Plaintiff at CHRISTUS St. Elizabeth, but as stated above, they are not employed by the hospital and the hospital is not liable for their conduct. Dr. Rushing's primary focus is on the alleged failure of the ER physicians to diagnose the cause of symptoms Plaintiff was experiencing and to properly treat those symptoms. This is the practice of medicine, something that a hospital and *205 nurses cannot do. See Tex. Occ. Code § 151.002(13) [ ]. A hospital cannot practice medicine and therefore cannot be held directly liable for any acts or omissions that constitute medical functions."
Objections filed by HealthSouth to the November Reports
HealthSouth filed its objections to the November Reports and a motion to dismiss on December 16, 2015. Therein, HealthSouth argued that Dr. Rushing failed to explain how his knowledge and experience in internal medicine, rheumatology, and geriatrics relates to the standard of care for non-physicians at a rehabilitation hospital, and Rushing failed to demonstrate any specific expertise in neurology, neurosurgery or spinal injury, and, therefore, his opinions "do not rise above anything more than the guesswork of an untrained, unskilled advocate."
HealthSouth also alleged that Dr. Rushing's November Report was conclusory as to the standard of care, breach, and causation. According to HealthSouth, Dr. Rushing was required to identify a standard of care "that could legally apply to a health care provider other than a physician[,]" and nurses and therapists cannot make a medical diagnosis or prescribe treatment. HealthSouth further argued that Dr. Rushing's November Report conflated a physician's responsibilities with those of nurses and therapists. In addition, HealthSouth alleged that Dr. Rushing's November Report did not identify specific methods by which Abshire's back should have been stabilized, failed to identify appropriate treatment, and failed to identify specifically what HealthSouth's personnel should have done differently.
HealthSouth argued that Dr. Rushing's November Report was conclusory as to causation because it did not explain how information taken during the admission process at HealthSouth or after Abshire was admitted at HealthSouth caused or contributed to her "pre-existing condition or even to Ms. Abshire's participation in physical therapy as the doctors had already ordered and approved her transfer to HealthSouth for rehabilitation therapy ." HealthSouth further complained that Dr. Rushing's November Report did not explain how Abshire's outcome would have been different had HealthSouth's staff, technicians, or nurses identified the nature of Abshire's condition one or two days earlier and that the report failed "to explain how the acts or omissions of HealthSouth's nurses and therapists contributed to a failure or delay in the testing being ordered, much less how the tests, if ordered, would have changed the outcome for this patient." HealthSouth argued that "[f]undamentally, Dr. Rushing is complaining that the physicians who saw Ms. Abshire prior to her transfer to HealthSouth missed a diagnosis of a pre-existing degenerative condition." And HealthSouth also asserted that Rushing's opinion that physical therapy should not have been initiated until after Dr. Smith evaluated Abshire was at odds with his statement that Dr. Smith did evaluate Abshire and continued physical therapy after she evaluated Abshire. HealthSouth also noted that Nurse Aguirre's report did not address HealthSouth.
Plaintiff's Response to the Objections
Abshire filed her response to Christus's objections on January 4, 2016, in which she argued "[e]very incomplete assessment was a missed opportunity for this hospital to have prevented Ms. Abshire's paraplegia." Abshire argued that the following section from Dr. Rushing's November Report adequately addressed how the nurses at Christus caused Abshire's injury:
The nurses failed on multiple occasions to document a complete and accurate *206 assessment of the patient. During multiple admissions the history of osteogenesis imperfecta was missed completely. During other admissions the patient's back pain and related symptoms were minimalized in the documentation ....
The lack of properly assessing Ms. Abshire's medical history and physical conditions is a breach in the standard of care. Lack of information results in a delay in proper medical care and is an impediment for the managing doctor to be able to order appropriate testing, and prescribe proper treatment and preventative care. In Ms. Abshire's case, had the symptomology that Ms. Abshire was experiencing been appropriately linked to the osteogenesis imperfecta diagnosis then the proper course of care would have been to admit the patient to the hospital on absolute bed rest, order imaging studies such as a CT or MRI of her back, then treat the injury to the spine as required by its severity by such methods as bracing through spinal fusion. The goal would be to alleviate pressure on the spine such that the compression fracture does not progress and paraplegia does not occur.
Abshire also filed her response to HealthSouth's objections on January 4, 2016. Therein Abshire argued that Dr. Rushing's opinion in his initial report as to causation by HealthSouth was not found insufficient by the trial court and that "Defendant is again improperly re-urging a defeated argument in an untimely manner." Abshire argued in the alternative that, if the trial court found the supplemental reports deficient, Abshire should be granted a thirty-day extension to cure any deficiency.
In its reply filed on January 6, 2016, HealthSouth responded to the points raised by the Plaintiff. In addition to its previous arguments, HealthSouth argued that "Plaintiff's final alleged deviation-beginning physical therapy on a patient with an unrecognized and undiagnosed compression fracture at T5-clearly presumes information not available to HealthSouth and applies an impermissible duty to make a medical diagnosis." HealthSouth argued that the order admitting Abshire for rehabilitation came from an emergency room physician and that "[n]owhere does Dr. Rushing explain a standard of care which should lead HealthSouth to ignore physician's orders and refuse to admit Ms. Abshire."
Trial Court's February 2016 Ruling and Order
On January 7, 2016, the trial court held a hearing on the objections to Dr. Rushing's November Reports and to Nurse Aguirre's Report, during which the parties made arguments but presented no additional evidence. The trial court issued a letter on February 29, 2016, explaining the trial court's decision to overrule the objections and deny the motions to dismiss.
In its letter, the trial court explained that it concluded that Dr. Rushing's qualifications were adequate because Rushing had supervised nurses for a fifteen-year period, had participated in setting medical policy at hospitals, and Rushing oversees rehabilitation efforts of his patients. The trial court wrote that Dr. Rushing had stated that the standard of care for the nurses at Christus was "to accurately assess, document and communicate matters to the physician[ ]" and Dr. Rushing cited "numerous examples" of a failure of the nursing staff to do so. The trial court wrote that Dr. Rushing had identified the standard of care for HealthSouth, which was to provide an "accurate assessment/evaluation and documentation at both the screening and admission stages and a continuing duty to assess the patient and report to Dr. Smith[ ]" and the "duty to *207 discontinue physical therapy under the circumstances of this case."
As to causation, the trial court wrote that Rushing had explained that
... proper treatment would have included a timely neuromuscular examination, diagnostic studies and, once the condition was discovered, admission to the hospital to stabilize the spine through bed rest, bracing or spinal fusion, as well as avoiding sitting upright or walking. Further, in Dr. Rushing's opinion, any exacerbation of Ms. Abshire's condition by physical therapy would have been avoided.
....
... the lack of information [due to the nurses' failure to chart] delayed and/or impeded timely assessment/correlation of symptoms to the patient's condition by the physicians. This delayed ordering diagnostic studies which, in turn, thereby delayed diagnosis and stabilization of Ms. Abshire's spine.
....
... an expert's opinion that, had nurses communicated certain information to a physician/surgeon a different, specifically identified, course of treatment should have been pursued thereby avoiding injury is not considered speculation[ ].
On March 21, 2016, the trial court entered an order overruling the objections filed by HealthSouth and Christus and denying the motions to dismiss.[5] HealthSouth and Christus timely filed their notices of appeal.
STANDARD OF REVIEW
We have jurisdiction over an interlocutory appeal of an order that denies all or part of the relief sought by a motion to dismiss under section 74.351(b). See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9). We review the trial court's decision regarding the adequacy of a Chapter 74 expert report under an abuse of discretion standard. See Van Ness v. ETMC First Physicians , 461 S.W.3d 140, 142 (Tex. 2015) (citing Rosemond v. Al-Lahiq , 331 S.W.3d 764, 766 (Tex. 2011) ; Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios , 46 S.W.3d 873, 878 (Tex. 2001) ). In reviewing the trial court's decision, we may not substitute our judgment for that of the trial court in reviewing factual matters or matters committed solely to the trial court's discretion. See In re Mem'l Hermann Hosp. Sys. , 464 S.W.3d 686, 698 (Tex. 2015) (citing Walker v. Packer , 827 S.W.2d 833, 839-40 (Tex. 1992) ); Bowie Mem'l Hosp. v. Wright , 79 S.W.3d 48, 52 (Tex. 2002). "Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred." Palladian Bldg. Co. v. Nortex Found. Designs, Inc. , 165 S.W.3d 430, 433 (Tex. App.-Fort Worth 2005, no pet.) (citing Downer v. Aquamarine Operators, Inc. , 701 S.W.2d 238, 241-42 (Tex. 1985) ). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." Wright , 79 S.W.3d at 52. A trial court also abuses its discretion if it fails to analyze or apply the law correctly. See In re Prudential Ins. Co. of Am. , 148 S.W.3d 124, 135 (Tex. 2004) (citing Walker , 827 S.W.2d at 840 ).
EXPERT REPORT REQUIREMENTS UNDER CHAPTER 74
A health care liability claimant must provide each defendant physician and *208 health care provider with an expert report within a specified time. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). The report serves a two-fold purpose: (1) to inform the defendant of the specific conduct the plaintiff has called into question; and (2) to provide a basis for the trial court to conclude the plaintiff's claims have merit. See In re Buster , 275 S.W.3d 475, 476-77 (Tex. 2008) (per curiam) (citing Palacios , 46 S.W.3d at 879 ); see also Wright , 79 S.W.3d at 52 ; HEB Grocery Co., L.L.P. v. Farenik , 243 S.W.3d 171, 173 (Tex. App.-San Antonio 2007, no pet.). The purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merit. Scoresby v. Santillan , 346 S.W.3d 546, 554 (Tex. 2011). "The expert report requirement is a threshold mechanism to dispose of claims lacking merit[.]" Certified EMS, Inc. v. Potts , 392 S.W.3d 625, 631 (Tex. 2013).
The statute defines "expert report" as follows:
... a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.
Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). The defendant may file challenges to the adequacy of the report. Id. § 74.351(l).
According to the express wording of the statute, the trial court "shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." Id. When determining whether the report represents an objective good faith effort to comply with the statute, the trial court's inquiry is limited to the four corners of the report. See Wright , 79 S.W.3d at 53 ("[T]he report must include the required information within its four corners."); Palacios , 46 S.W.3d at 878 ("a trial court should look no further than the report" to determine whether it meets the statutory requirements). To constitute a good faith effort, the report "must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." Palacios , 46 S.W.3d at 875 ; see also Wright , 79 S.W.3d at 52.
While the report "need not marshal all the plaintiff's proof," it must provide a fair summary of the expert's opinions as to the applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. Jernigan v. Langley , 195 S.W.3d 91, 93 (Tex. 2006) ; Palacios , 46 S.W.3d at 875, 878 ; see also Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). In determining the adequacy of an expert report, a court reviews the pleadings to determine the claims alleged and whether the report addresses those claims. See Christus Health Se. Tex. v. Broussard , 306 S.W.3d 934, 938 (Tex. App.-Beaumont 2010, no pet.) (citing Windsor v. Maxwell , 121 S.W.3d 42, 51 (Tex. App.-Fort Worth 2003, pet. denied) ). The report must "explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented." Jelinek v. Casas , 328 S.W.3d 526, 539-40 (Tex. 2010).
*209 An expert report concerning the breach of the standard of care of a health care provider or causation of an injury that is "authored by a person who is not qualified to testify ... cannot constitute an adequate report." In re Windisch , 138 S.W.3d 507, 511 (Tex. App.-Amarillo 2004, orig. proceeding) ; see Ehrlich v. Miles , 144 S.W.3d 620, 624-26 (Tex. App.-Fort Worth 2004, pet. denied) (applying former version of section 74.351(a) ). A physician is qualified to submit an expert report on the causal relationship between a departure from the standard of care and an injury when he would otherwise be qualified to address causation under the Texas Rules of Evidence. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(C). A person may qualify as an "expert" on the question of whether the health care provider departed from the accepted standard of care if the person (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider; (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care. Id. § 74.402(b) (West 2011). To be qualified on the basis of training or experience, the person must be certified by a state or national professional certifying agency or have other substantial training or experience in an area of the health care practice relevant to the claim and must be actively practicing health care or rendering health care services relevant to the claim. Id. § 74.402(c).
In determining whether an expert is qualified, the focus is not on the defendant physician's area of expertise, but on the condition involved in the claim. McKowen v. Ragston , 263 S.W.3d 157, 162 (Tex. App.-Houston [1st Dist.] 2007, no pet.). Every licensed medical doctor is not automatically qualified to testify as an expert on every medical question, and the proponent of the testimony must show that the expert possesses special knowledge regarding the matter on which he proposes to give an opinion. Ehrlich , 144 S.W.3d at 625 (citing Broders v. Heise , 924 S.W.2d 148, 152-53 (Tex. 1996) ). Accordingly, the offered report must demonstrate that the expert has " 'knowledge, skill, experience, training, or education regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject.' " Id. (quoting Roberts v. Williamson , 111 S.W.3d 113, 121 (Tex. 2003) ).
The expert report must establish that the expert is qualified to render opinions about the standard of care and causation, and the reviewing court cannot fill in gaps in a report by drawing inferences. Rosemond v. Al-Lahiq , 362 S.W.3d 830, 834 (Tex. App.-Houston [14th Dist.] 2012, pet. denied) ("The qualifications of the expert necessary to fulfill the criteria for an expert under section 74.351 must be found within the four corners of the expert report itself and the expert's curriculum vitae."); see also, e.g. , Collini v. Pustejovsky , 280 S.W.3d 456, 465-67 (Tex. App.-Fort Worth 2009, no pet.) (Trial court erred in denying the physician's motion to dismiss because the report did not demonstrate that the expert was qualified to testify with regard to causation.).
It is unnecessary for the expert in his report to rule out all other possible causes or meet summary judgment or trial standards of proof. Palacios , 46 S.W.3d at 879 ; Baylor Med. Ctr. v. Wallace , 278 S.W.3d 552, 562 (Tex. App.-Dallas 2009, no pet.). "If a health care liability claim contains at least one viable *210 liability theory, as evidenced by an expert report meeting the statutory requirements, the claim cannot be frivolous." Potts , 392 S.W.3d at 631. "[T]o constitute a good-faith effort to establish the causal-relationship element, the expert report must fulfill Palacios 's two-part test." Wright , 79 S.W.3d at 52 (citing Palacios , 46 S.W.3d at 879 ). The expert report must explain the basis of the expert's opinions and link them to the facts. Id. ; Windsor , 121 S.W.3d at 47 (quoting Earle v. Ratliff , 998 S.W.2d 882, 890 (Tex. 1999) ).
When determining whether a report adequately explains how the defendant health care provider caused an injury to a patient, we evaluate whether the report demonstrates causation beyond mere conjecture. See Wright , 79 S.W.3d at 53 (a conclusory report does not meet the statutory requirements); Rosemond , 362 S.W.3d at 836 (same); see also HEB Grocery Co., LP v. Galloway , No. 09-13-00486-CV, 2014 WL 2152128, at *5-6, 2014 Tex. App. LEXIS 5506, at *16 (Tex. App.-Beaumont May 22, 2014, no pet.) (mem. op.) (an expert report must do more than merely make conclusory statements and should address causation and the link between the negligence and the injury alleged). A causal relationship is established "by proof that the negligent act or omission was a substantial factor in bringing about the harm and without which the harm would not have occurred." Costello v. Christus Santa Rosa Health Care Corp. , 141 S.W.3d 245, 249 (Tex. App.-San Antonio 2004, no pet.). As the Court explained in Jelinek ,
[w]hen the only evidence of a vital fact is circumstantial, the expert cannot merely draw possible inferences from the evidence and state that "in medical probability" the injury was caused by the defendant's negligence. The expert must explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts. Thus, when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion.
328 S.W.3d at 536.
A plaintiff may satisfy the statutory requirements by serving reports by separate experts. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(i). Where a plaintiff does so, we consider the expert reports in the aggregate, and a single expert need not address all liability and causation issues with respect to a defendant. Id. ; see also Tenet Hosps. Ltd. v. De La Rosa , 496 S.W.3d 165, 170 (Tex. App.-El Paso, 2016, no pet.) ; Gannon v. Wyche , 321 S.W.3d 881, 896 (Tex. App.-Houston [14th Dist.] 2010, pet. denied) ; Packard v. Guerra , 252 S.W.3d 511, 526 (Tex. App.-Houston [14th Dist.] 2008, pet. denied).
ANALYSIS AS TO HEALTHSOUTH
On appeal, HealthSouth argues that the trial court abused its discretion in finding that Dr. Rushing's supplemental report, read together with Nurse Aguirre's report, met the statutory requirements because Dr. Rushing was not qualified under the statute and he did not sufficiently address standard of care, breach, and causation.[6]
*211 Because Nurse Aguirre's report addressed only standard of care and breach as to Christus, we do not consider her report in determining whether Dr. Rushing's expert report was sufficient as to HealthSouth.
Standard of Care and Breach
HealthSouth argues that Dr. Rushing's supplemental report is conclusory as to standard of care and breach. HealthSouth argues that the supplemental report contains statements regarding factual assertions that are also "verifiably inaccurate or misleading as revealed by the medical records."
Quoting and citing to Baptist Hospitals of Southeast Texas v. Carter , No. 09-08-067-CV, 2008 WL 2917109, at *3 n.4, 2008 Tex. App. LEXIS 5692, at **8-10 n.4 (Tex. App.-Beaumont, July 31, 2008, no pet.) (mem. op.), HealthSouth argues that "the records that an expert reviewed could be relevant to a court's determination of whether the report presents a fair summary of the factual basis of the expert's opinion." HealthSouth's brief then references a Preadmission Screening Form that HealthSouth had included as an attachment to its objections and argues that certain of Dr. Rushing's statements are inconsistent with the Preadmission Screening Form.[7]
Since our opinion in Carter , the Supreme Court has explained:
We have previously held that a trial court should look no further than the four corners of an expert report when considering a motion challenging the adequacy of the report because all the information relevant to that inquiry is contained within the report. See Bowie Mem'l Hosp. v. Wright , 79 S.W.3d 48, 52 (Tex. 2002). Section 74.351(l) does not explicitly state that a trial court may not *212 look beyond the report to determine adequacy, but we have held this is so because the statute specifically focuses on what the report discusses. Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios , 46 S.W.3d 873, 878 (Tex. 2001).
Samlowski v. Wooten , 332 S.W.3d 404, 414 (Tex. 2011). "If the facts do not support a plaintiff's claim, summary judgment procedure provides a remedy." Schrapps v. Pham , No. 09-12-00080-CV, 2012 WL 4017768, at *3, 2012 Tex. App. LEXIS 7781, at *8 (Tex. App.-Beaumont Sept. 13, 2012, pet. denied) (mem. op.) (citing Tex. R. Civ. P. 166a ). Accordingly, we decline the invitation to evaluate the factual accuracy of Dr. Rushing's November Report.
Next, HealthSouth argues that Dr. Rushing's supplemental report as to HealthSouth impermissibly "seek[s] to impose responsibilities for practicing medicine upon a non-physician healthcare provider[.]" According to HealthSouth, "Dr. Rushing continuously pinned his analysis upon unidentified 'proper diagnostic testing,' exploration, and other diagnostic treatment and assessments which could only be ordered by a physician[.]" HealthSouth specifically notes that Dr. Rushing's supplemental report stated that the standard of care for HealthSouth required HealthSouth to "properly evaluate and assess Ms. Abshire before admission."
HealthSouth argues, and we agree, that it cannot be held directly liable for functions that require the practice of medicine. See Doctors Hosp. at Renaissance, Ltd. v. Andrade , 493 S.W.3d 545, 548 (Tex. 2016) (explaining that a hospital is an institution licensed to provide health care, but only a licensed doctor can provide medical care); Reed v. Granbury Hosp. Corp. , 117 S.W.3d 404, 415 (Tex. App.-Fort Worth 2003, no pet.) ("A hospital cannot practice medicine and therefore cannot be held directly liable for any acts or omissions that constitute medical functions.") (citing Spinks v. Brown , 103 S.W.3d 452, 456 n.4 (Tex. App.-San Antonio 2002, pet. denied) ); see also Tex. Occ. Code Ann. § 151.002(a)(13) (West Supp. 2016) (defining "practicing medicine" as the diagnosis, treatment, or offer to treat a physical disease, disorder, or injury by a licensed physician or surgeon); itation index="75" url="https://cite.case.law/citations/?q=Tex.%20Code%20Ann.%20%C2%A7%20151.002">id. §§ 155.001, 155.003 (West 2012) (prohibiting a person from practicing medicine without a license and providing no means by which a hospital can become licensed). "Only doctors are legally authorized to make a medical diagnosis by evaluating a patient's medical treatment and the development of subsequent symptoms to conclude that a particular medical condition has resulted." Methodist Hosp. v. German , 369 S.W.3d 333, 343 (Tex. App.-Houston [1st Dist.] 2011, pet. denied). Therefore, as a matter of law, the standard of care for HealthSouth cannot require the hospital or its non-physician employees to make a diagnosis.
HealthSouth also challenges the supplemental report where Dr. Rushing opined "that HealthSouth should have refused the physicians' orders admitting Ms. Abshire into a physical therapy program" arguing that such allegations "fail to describe any process the hospital's employees should have utilized to refuse the orders[.]" According to HealthSouth, Dr. Rushing's supplemental report essentially "required HealthSouth to defy or ignore physicians' orders[ ]" and that "HealthSouth is being criticized in this case for following physician orders, not violating them." Additionally, HealthSouth criticizes the report because Dr. Rushing did not explain what the physical therapists should have found that the admitting doctor missed. Finally, HealthSouth argues that Dr. Rushing's supplemental report "includes only bare conclusions that Abshire should have never been admitted[ ]" without *213 specifying what alternative actions HealthSouth or its non-physician workers should have taken.
Abshire argues that Dr. Rushing's report was adequate to put HealthSouth on notice of the specific conduct complained of because Rushing opined that "HealthSouth breached the standard of care by failing to follow the proper steps in evaluating and assessing Ms. Abshire, a patient with an undiagnosed spinal cord injury, upon admission and began physical therapy on a patient who should not have participated in physical therapy." Abshire contends that her expert report "makes it clear that HealthSouth did not have a duty to diagnose Ms. Abshire's spinal injury[ ]" or to stabilize her spine.
The Supreme Court has made clear that "[i]dentifying the standard of care [in a health care liability claim] is critical [and] [w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." Palacios , 46 S.W.3d at 880. Although Rushing complains about the failure of HealthSouth to properly diagnose Abshire, or to assess her before admission, or to perform "proper testing[,]" Rushing did not identify what constitutes "proper testing" and whether such testing should have been performed by HealthSouth, Christus, or another. Nothing in Rushing's report suggests that HealthSouth's admissions screener was (or should have been) legally qualified to order testing, and diagnostic assessment and testing may only be ordered by a licensed physician. See Tex. Occ. Code Ann. § 151.002(a)(13) ; German , 369 S.W.3d at 342-43 (an expert report may not impose a higher standard of care than allowed by law). Moreover, Dr. Rushing's reports fail to specify what assessment or testing (whether diagnostic or otherwise) HealthSouth should have performed. We find Rushing's opinion that HealthSouth should not have accepted Abshire as a patient or that it did not perform "proper testing" to be impermissibly conclusory as to the element of breach because he failed to provide "specific information about what the defendant should have done differently[ ]" in regard to assessment. See Palacios , 46 S.W.3d at 880.
Dr. Rushing's November Report also reflects that, after a physical therapist notified Dr. Smith (who is not a party to this suit) of Abshire's complaints during physical therapy on December 4, 2012, Dr. Smith evaluated Abshire on the same day and, according to Dr. Rushing, Dr. Smith "recognized that there was a significant change now versus the preadmission assessment" and nevertheless "recommended that [Abshire] continue a 3 hour per day, 5+ day per week therapy program starting immediately." There is nothing in Dr. Rushing's reports indicating that the standard of care for the physical therapists at HealthSouth required them to challenge or to act contrary to Dr. Smith's orders.[8] Dr. Rushing's November Report fails to identify what assessment or evaluation the physical therapist should have done or to explain how or in what manner HealthSouth breached the applicable duty relating to Abshire's admission or treatment. Dr. Rushing's opinion that HealthSouth had a duty to "properly evaluate and assess" Abshire prior to physical therapy is impermissibly conclusory. See Palacios , 46 S.W.3d at 880.
*214 Causation
In addition to the foregoing, HealthSouth argues that Dr. Rushing's supplemental report is conclusory as to causation. An opinion on causation requires "proof that the negligent act or omission was a substantial factor in bringing about the harm and without which the harm would not have occurred."See Costello , 141 S.W.3d at 249. According to Rushing's November Report, HealthSouth's failure to properly assess "caused continued delay in the treatment of her spinal fracture and the continued worsening of her paralysis and other symptoms[,]" resulted in HealthSouth beginning therapy "on a patient with a spinal cord injury [,]" and "likely caused exacerbation to the spinal cord injury." Rushing's November Report also stated that stabilization and treatment "could have prevented further damage[ ]" and "some of the damage may have been reversible."
We conclude that Dr. Rushing's supplemental report fails to set forth a specific link between HealthSouth's alleged omissions and Abshire's injuries. See Diagnostic Research Grp. v. Vora , 473 S.W.3d 861, 873 (Tex. App.-San Antonio 2015, no pet.) (expert report was deficient where it did not provide a fair summary of the expert's opinions on the causal relationship between the asserted breach in the standard of care and the alleged harm with enough specificity to allow the trial court to conclude the plaintiff's claims had merit and to adequately inform the defendant of the specific conduct that plaintiff called into question); Craig v. Dearbonne , 259 S.W.3d 308, 313 (Tex. App.-Beaumont 2008, no pet.) (expert report was deficient because, among other things, the expert "did not explain how the delay [in treatment] caused the disease to worsen or become more difficult to treat, and the report failed to explain whether earlier treatment would have been effective").
Rushing's November Report states that "[h]ad the proper testing been performed prior to admission to Healthsouth, the damage to Ms. Abshire's spine could have been minimalized." Dr. Rushing's November Report further states that on December 5, 2013, after Abshire had left HealthSouth and been admitted at Baptist Hospital, "orders were entered to transfer Ms. Abshire to Memorial Hermann-Houston [and] [s]he was diagnosed with a Compression Fracture of T-5 with loss of motor function to lower extremities." Rushing also states that "[i]n severe cases of osteoporosis, coughing or sneezing can ca[u]se compression fractures."
A Chapter 74 expert report may not have an "analytical gap" or a "missing link" between the expert's allegation that the healthcare provider defendant breached the standard of care and the plaintiff's injuries. See THN Physicians Ass'n v. Tiscareno , 495 S.W.3d 914, 922 (Tex. App.-El Paso 2016, no pet.) (citing Clark v. HCA, Inc. , 210 S.W.3d 1, 11 (Tex. App.-El Paso 2005, no pet.) ). An opinion on causation that contains an obvious gap in the chain of causation does not meet the statute's requirements. See Wright , 79 S.W.3d at 53 (failure to explain how not reading x-rays led to injury).
Dr. Rushing offered no opinion regarding when or how Abshire's compression fracture or spinal cord injury occurred. Lacking any opinion or factual recitation regarding when Abshire's compression fracture or spinal cord injury occurred, much less any opinion linking such fracture to the therapy or treatment received at HealthSouth, Rushing's report fails to explain how or why any actions by HealthSouth worsened or exacerbated her harm, injury, or damages. See Jelinek , 328 S.W.3d at 536 (an expert report must explain, *215 to a reasonable degree of medical probability, how and why the alleged negligence caused the injury); Estorque v. Schafer , 302 S.W.3d 19, 29 (Tex. App.-Fort Worth 2009, no pet.) (an expert report that leaves gaps by not explaining how or why a provider's failures to acts worsened the progression of the listed conditions is insufficient). Dr. Rushing's report does not adequately address causation because, in the face of several possible conclusions regarding when in the chain of events Abshire's injury or injuries occurred, Rushing has not explained how his conclusion that HealthSouth caused (or exacerbated) her injuries "are medically preferable to competing inferences that are equally consistent with the known facts." See Jelinek , 328 S.W.3d at 536. Dr. Rushing's opinion that HealthSouth "exacerbated" an injury relies on an analytical gap that a court may not fill by inference. See THN Physicians Ass'n v. Tiscareno , 495 S.W.3d 599, 613-14 (Tex. App.-El Paso 2016) (where expert report included no express statement that mother was in fact suffering from chorioamnionitis at the time of her delivery, in order to conclude that her infant was injured due to exposure to chorioamnionitis in utero, the trial court would have had to make an impermissible inference that mother was in fact suffering from chorioamnionitis at the time of her delivery).
Rushing's reports also fail to explain how improper evaluation and assessment at HealthSouth was a substantial factor in causing or exacerbating Abshire's injuries, or that proper evaluation and assessment would have changed the course of her treatment or her outcome. See Ngo v. Lewis , No. 09-10-00140-CV, 2010 WL 3518225, at **3, 4-5, 2010 Tex. App. LEXIS 7432, at **8, 13-15 (Tex. App.-Beaumont Sept. 9, 2010, no pet.) (mem. op.) (expert report that "merely asserts that causation exists is not enough[ ]" and was insufficient for not explaining the basis of the expert's opinions and for not identifying anything defendant physicians could have done to change the outcome). Therefore, Dr. Rushing's opinion as to HealthSouth rests on an analytic gap that renders his opinion as to HealthSouth conclusory. See Clark , 210 S.W.3d at 11 ; cf. Christus Health Gulf Coast v. Davidson , No. 14-15-00643-CV, 2016 WL 2935715, at **4-6, 2016 Tex. App. LEXIS 5164, at **11-15 (Tex. App.-Houston [14th Dist.] May 17, 2016, no pet.) (mem. op.) (expert's causation opinion that nursing staff's failure to identify symptoms and to communicate assessments and lab results caused patient's injury was conclusory because expert reports showed nursing staff was in communication with the physicians and expert did not explain how additional communication would have changed patient's care or outcome).
Accordingly, we conclude that Dr. Rushing's opinion as to standard of care, breach, and causation by HealthSouth is insufficient. See, e.g. , Galloway , 2014 WL 2152128, at **1-7, 2014 Tex. App. LEXIS 5506, at **1-20 (expert report failed to explain how the misfilled prescription would have contributed to any of plaintiff's symptoms or injuries, and the report failed to provide the basis for the expert's conclusion); Clapp v. Perez , 394 S.W.3d 254, 262 (Tex. App.-El Paso 2012, no pet.) (expert report was not sufficient where, among other deficiencies, the report failed to demonstrate a causal link between the doctors' conduct and the patient's death); Ngo , 2010 WL 3518225, at **3, 4-5, 2010 Tex. App. LEXIS 7432, at **8, 14-15. We need not address Dr. Rushing's qualifications to render an opinion as to HealthSouth because we have determined that the reports are deficient for other reasons. See Tex. R. App. P. 47.1.
ANALYSIS AS TO CHRISTUS
On appeal, Christus argues that the supplemental reports-that is, Dr. Rushing's *216 second report as to Christus and Nurse Aguirre's report-are conclusory as to standard of care, breach, and causation and the reports fail to meet the requirements of section 74.351. Christus argues that the supplemental reports were conclusory and deficient as to standard of care because they did not explain what the nurses should have done differently to "obtain a complete medical history" of Abshire. Christus argues that Rushing's November Report was "conclusory as to the nurses on causation and not supported by the medical facts of this case[ ]" and failed to causally link the nurses' alleged failure to document Abshire's history of OI to Abshire's injuries. Both Christus's and Abshire's arguments to the trial court and on appeal address only the conduct of Christus's nurses or other nonphysician hospital staff, and we limit our analysis of the expert reports accordingly. See Tex. R. App. P. 47.1.
Standard of Care and Breach
Christus argues that the supplemental reports were deficient as to standard of care because they did not explain what the nurses should have done differently to "obtain a complete medical history" of Abshire and for this reason, the supplemental reports were conclusory. Citing to Palacios , Christus maintains that the supplemental reports did not "explain what steps are required for a nurse to document a complete and accurate assessment, and [did] not explain what the nurses should have done differently in Abshire's case." Christus argues that Nurse Aguirre did not explain what the nurses should have asked Abshire or whether the standard of care required the nurses to pull prior medical records to contact Abshire's family members. And, Christus also argues that Dr. Rushing's supplemental report did not explain what the nurses should have done but failed to do in order to obtain and record the information that Abshire had a history of OI.
We have already noted herein that "[i]dentifying the standard of care [in a health care liability claim] is critical [and] [w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." Palacios , 46 S.W.3d at 880. Nevertheless, because we conclude the reports were insufficient on causation, we need not address Christus's arguments as to standard of care and breach. See Tex. R. App. P. 47.1.
Causation
Christus argues that Rushing's supplemental report and Nurse Aguirre's report were "conclusory as to the nurses on causation and not supported by the medical facts of this case." As explained earlier herein, we limit our consideration of alleged facts to the four corners of the expert reports. See Wright , 79 S.W.3d at 52. We also limit our causation review to Dr. Rushing's report because a nurse may not render an opinion on causation. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5) ; Benish v. Grottie , 281 S.W.3d 184, 205 (Tex. App.-Fort Worth 2009, pet. denied) ("[A] nurse cannot offer an opinion in a statutory expert report on causation."); Kelly v. Rendon , 255 S.W.3d 665, 675-76 (Tex. App.-Houston [14th Dist.] 2008, no pet.) ("[A] nurse is not qualified to render an opinion on medical causation.").
According to Christus, Dr. Rushing's second report fails to causally link the nurses' alleged failure to document Abshire's history of OI to Abshire's injuries.
Rushing does not explain how and why the nurses' failure to document OI on November 19 was the proximate cause of any exacerbation of an undiagnosed fracture or paraplegia, particularly *217 in light of the fact that the ER physicians had the medical history of OI information by November 22 and still (according to Rushing) failed to order the needed tests, make the diagnosis, and prescribe the treatment allegedly needed to prevent further injury.
....
If the physicians allegedly did not properly diagnose and treat the alleged fracture when they had the necessary information about her history of OI on November 22 and 23, Rushing did not explain or otherwise establish how things would have been different if the nurses had documented a history of OI three days earlier, on November 19.
A Chapter 74 expert report may not have an "analytical gap" or a "missing link" between the expert's allegation that the healthcare provider defendant breached the standard of care and the plaintiff's injuries. See Tiscareno , 495 S.W.3d at 922 (citing Clark , 210 S.W.3d at 11 ). An opinion on causation that contains an obvious gap in the chain of causation does not meet the statute's requirements. See Wright , 79 S.W.3d at 53 (failure to explain how not reading x-rays led to injury).
According to Dr. Rushing's report, the physicians did not order tests, make a diagnosis, or provide spinal treatment or stabilization even after they documented Abshire's history of OI. Therefore, Rushing's opinion that the nurses' failure to chart Abshire's history of OI caused Abshire's injury rests on an analytic gap that renders his causation opinion as to the nurses conclusory. See Clark , 210 S.W.3d at 11. Rushing's report, even as supplemented, fails to explain how the nurses' alleged failure to document OI was a substantial factor in causing or exacerbating Abshire's injuries, or that had such been known then the physicians would have changed the course of treatment, or that it would have changed the outcome. See Ngo , 2010 WL 3518225, **3-4, 4-5, 2010 Tex. App. LEXIS 7432, **10-11, 13-14 (expert reports were conclusory where they failed to explain how alleged delays were substantial factors in causing plaintiff's death). Accordingly, we conclude that Dr. Rushing's expert report does not meet the requirements of section 74.351 because the report is deficient.
Additionally, Rushing's opinions about causation by the "hospital staff" were deficient because they failed to distinguish between causation as to the nurses and causation as to the physicians. Dr. Rushing's supplemental report articulated a standard of care for the nurses at Christus and a different standard of care for the emergency room physicians. However, in discussing causation, Dr. Rushing makes multiple references to the "failure of the hospital staff[.]" Christus argues that "lumping together" the nurses and physicians renders Dr. Rushing's causation opinion conclusory and inadequate. We need not address this argument because we have determined that the expert reports are deficient for other reasons. See Tex. R. App. P. 47.1.
THIRTY-DAY EXTENSION
The plain language of section 74.351 permits one thirty-day extension to cure a specified deficiency in an expert report. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c) ; see also Leland v. Brandal , 257 S.W.3d 204, 207 (Tex. 2008). Abshire has already received one thirty-day extension to cure deficiencies in her expert report, and the statute provides no basis for another extension. Therefore, we overrule Abshire's request for an additional extension.
Having found the experts' reports insufficient as to both HealthSouth and Christus, we reverse the trial court's order overruling *218 Appellants' objections to the expert reports and denying their motions to dismiss. We remand the cause to the trial court for the determination of attorney's fees under section 74.351(b)(1), and for entry of a final order dismissing Appellee's claims against Appellants HealthSouth and Christus.
REVERSED AND REMANDED.

We cite to the current version of statutes, as subsequent amendments do not affect the disposition of this appeal.

Dr. Fasullo and Dr. Marchand are not parties to this appeal, and the appellate record does not include a copy of the objections they filed to Dr. Rushing's June Report. We need not determine whether the trial court erred in its rulings as to Fasullo and Marchand because neither defendant is a party to this appeal.

The record reflects that Dr. Smith was not an employee of HealthSouth, and Abshire did not name Dr. Smith as a defendant in her petition.

In her response to HealthSouth's objections in the trial court, Plaintiff also argued that HealthSouth had waived all objections by having served a request for written discovery. That issue is not before us on appeal.

The trial court also denied objections filed by Doctors Fasullo and Marchand, but as we have explained, the doctors are not parties to this appeal.

HealthSouth's arguments in its brief are organized around the issues of qualifications, standard of care and breach, and causation. In addition, HealthSouth enumerates the following "issues," and for purposes of this appeal, we consider each of these points together:
1. Whether an expert's opinion complies with the expert report requirements when using inconsistent statements of facts and inaccurate and misleading discussions of medical records.
2. Whether an expert's criticisms of a rehabilitation hospital with no physician employees may include diagnostic standards requiring the practice of medicine by the hospital in violation of Texas law.
3. Whether an expert's criticism of a rehabilitation hospital with no physician employees for admitting a patient into a physical therapy program adequately addresses a standard of care and breach thereof, absent a description of a valid process to be followed by non-physicians for reaching a different diagnosis and altering the physicians' orders admitting the patient into the physical therapy program.
4. Whether an expert's criticism that a rehabilitation hospital with no physician employees should have properly "evaluated" and "assessed" a patient states a standard of care and breach absent details regarding the method of evaluation or assessment which should have been conducted.
5. Whether an expert in a case relating to a delay in diagnosis adequately addresses causation without demonstrating how a rehabilitation hospital with no physician employees caused or exacerbated a patient's pre-existing, undiagnosed medical condition by following prescribed treatment orders calling for physical therapy.
6. Whether an expert's causation opinion must include a factual and medical basis for the conclusion that the patient's undiagnosed preexisting condition was exacerbated or caused by the caregiver's actions in following a prescribed healthcare treatment plan.
7. Whether a physician that has no experience in working at or for a rehabilitation hospital adequately demonstrates the expertise to address the standard of care for admission staff, nurses, and therapists at a rehabilitation hospital.

We note that, in his November Report, Dr. Rushing explained that the records he reviewed in developing his opinion included those of Christus, HealthSouth, Baptist Beaumont Hospital, Memorial Hermann-Houston, and Memorial Hermann-The Institute for Rehabilitation and Research. None of the parties claim that all the medical records considered were before the trial court nor included in the appellate record.

Dr. Rushing's reports do not state that the physical therapists have a duty to act contrary to a physician's orders, and we are limited to the four corners of the expert's report in making our evaluation. See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios , 46 S.W.3d 873, 878 (Tex. 2001).