

# NUMBER 13-18-00231-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

MARIA ZAMARRIPA, AS GUARDIAN
OF THE ESTATES OF R.F.R. AND
R.J.R., MINORS,                                                          Appellant,

v.

COLUMBIA VALLEY HEALTH CARE
SYSTEM, L.P., D/B/A VALLEY
REGIONAL MEDICAL CENTER,                                     Appellee.

On appeal from the 445th District Court
of Cameron County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria**
**Memorandum Opinion by Chief Justice Contreras**

This is an appeal of the trial court's dismissal of a health care liability suit for failure

to comply with the expert report requirement of chapter 74 of the civil practice and

remedies code, the Texas Medical Liability Act (TMLA).  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (West, Westlaw through 2017 1st C.S.).  Appellant Maria Zamarripa, as guardian of the estates of R.F.R. and R.J.R., minors, argues by a single issue that the trial court erred in granting the motion to dismiss filed by appellee, Columbia Valley Health Care System, L.P., d/b/a Valley Regional Medical Center (VRMC), on the basis that Zamarripa's supplemental expert reports were insufficient on the issue of causation.  We reverse and remand.

## I. BACKGROUND

The underlying suit arose from the tragic death of 36-year-old Yolanda Flores and her unborn child.  According to the pleadings, Flores was admitted to VRMC on March 6, 2012, for assessment of her pregnancy.  At that time, she complained of back pain and suprapubic pressure.  An ultrasound was performed, the results of which were "suggestive of a complete placental previa."[1]  On May 15, when Flores was around 32 weeks pregnant, she began vomiting and was taken by ambulance to VRMC, where she was assessed and treated by obstetrician/gynecologist Patrick Ellis.  An MRI showed placenta accreta[2] but no placental abruption.[3]  Dr. Ellis ordered Flores's transfer from

---

[1] Placenta previa "occurs when a baby's placenta partially or totally covers the mother's cervix—the outlet for the uterus.  Placenta previa can cause severe bleeding during pregnancy and delivery." *Placenta previa*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/placenta-previa/symptoms-causes/syc-20352768 (last visited Feb. 25, 2019).

[2] Placenta accreta is "a serious pregnancy condition that occurs when the placenta grows too deeply into the uterine wall.  Typically, the placenta detaches from the uterine wall after childbirth.  With placenta accreta, part or all of the placenta remains attached.  This can cause severe blood loss after delivery."  *Placenta accreta*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/placenta-accreta/symptoms-causes/syc-20376431 (last visited Feb. 25, 2019).

[3] Placental abruption "occurs when the placenta partially or completely separates from the inner wall of the uterus before delivery.  This can decrease or block the baby's supply of oxygen and nutrients and cause heavy bleeding in the mother."  *Placental abruption*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/placental-abruption/symptoms-causes/syc-20376458 (last visited Feb. 25, 2019).

2

VRMC in Brownsville to Bay Area Hospital (BAH) in Corpus Christi, over 150 miles away. According to records, the transfer was ordered for a "medical necessity upgrade in care." BAH obstetrician/gynecologist Whitney Gonsoulin approved the transfer. While en route to BAH, Flores suffered a placental abruption, causing severe bleeding. At BAH, an emergency caesarian section and hysterectomy were performed. However, Flores and her unborn child died that night.

Zamarripa alleged in a petition in intervention[4] that VRMC was negligent because its nurses allowed Flores to be discharged on May 12, 2012, and because it allowed Flores to be transferred to Corpus Christi.[5] To comply with the TMLA's expert report requirement, Zamarripa filed reports by Frederick Harlass, M.D., and Grace Spears, a registered nurse. VRMC objected to the reports and moved to dismiss the suit, contending that the reports were insufficient. The trial court overruled the objections and denied the motion to dismiss, and we affirmed. *Columbia Valley Healthcare Sys. L.P. v. Zamarripa*, 520 S.W.3d 62 (Tex. App.—Corpus Christi 2015), *rev'd*, 526 S.W.3d 453, 460 (Tex. 2017). On VRMC's petition for review, the Texas Supreme Court reversed, holding in part that "[i]n showing how and why a breach of the standard of care caused injury, the expert report must make a good-faith effort to explain, factually, how proximate cause is

---

[4] Flores's husband, Reynaldo Ramirez, initially filed suit in his personal capacity, as representative of Flores's estate, and as next friend of their minor children R.F.R. and R.J.R. Olga Flores and Zamarripa later jointly filed a petition in intervention noting that, as temporary administrator of Flores's estate and temporary guardian for the minor children, respectively, they were the proper party representatives.

Although Olga Flores and Zamarripa are both named plaintiffs in the final judgment and are represented by the same counsel, only Zamarripa filed a notice of appeal. Accordingly, Olga Flores is not a party to this appeal.

[5] Ramirez's suit also named BAH, Ricardo Lemus, M.D., Ellis, Gonsoulin, and Hidalgo County Emergency Medical Service Foundation as defendants. Zamarripa sought to intervene in the suit as to all defendants. The causes of action against the non-VRMC defendants were severed from this case and are not at issue in this appeal.

3

going to be proven." 526 S.W.3d at 460. The Court noted that, though Spears stated in her report that VRMC's nurses breached their applicable standards of care, Spears could not opine on causation. *Id.* at 461 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C) (providing that only a physician may provide expert testimony on the causal relationship between a breach of the standard of care and injury)). And while Harlass stated that VRMC caused Flores to be in an ambulance by "permitting and facilitating the transfer" to BAH, he noted that it was Dr. Ellis—not VRMC or its nurses— that actually ordered the transfer. *Id.* Because neither report explained how VRMC "had either the right or the means to persuade Dr. Ellis not to order the transfer or to stop it when he did," the reports were insufficient to show that VRMC proximately caused Flores's injury and death. *Id.*

On remand, the trial court granted Zamarripa a 30-day extension to file a compliant report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c). Zamarripa filed supplemental expert reports, one by Spears and one by Steven Edmondson, M.D. Again, VRMC objected to the reports and filed a motion to dismiss under chapter 74. This time, the trial court sustained the objections and granted the motion. This appeal followed.[6]

## II. DISCUSSION

### A. Applicable Law and Standard of Review

Under the TMLA, a plaintiff in a health care liability suit must serve the defendant with a compliant expert report accompanied by the expert's curriculum vitae. *Id.* § 74.351(a). If a plaintiff fails to do so within 120 days of filing suit, the trial court must

---

[6] The parties refer to this appeal as an accelerated interlocutory appeal. However, the trial court ordered all claims other than those against VRMC severed into a different cause number. Therefore, the judgment on appeal is not interlocutory, and this appeal is not accelerated under the rules. *Cf.* TEX. R. APP. P. 28.1.

4

dismiss the claim with prejudice on the defendant's motion. *Id.* § 74.351(b)(2). The goal of the statute is "to deter frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit." *Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 552 (Tex. 2011)). Therefore, "[a]n expert report . . . is a low threshold a person [bringing a claim] against a health care provider must cross merely to show that his claim is not frivolous." *Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012).

> To comply with the statute, an expert report must
>
> provide[] a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). A court must grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good-faith effort to comply with the definition of an expert report set forth above. *Id.* § 74.351(*l*). A good-faith effort must provide enough information to (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 513 (Tex. 2017); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam). All information needed for this inquiry is found within the four corners of the expert report, which need not marshal all of the plaintiff's proof. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010)

Notwithstanding the fact that chapter 74 speaks only of a "causal relationship" and does not refer to "proximate cause," the Texas Supreme Court has held that an expert report must explain how and why the defendant's breach *proximately* caused the plaintiff's

5

injury. *Zamarripa*, 526 S.W.3d at 460 ("[A] plaintiff asserting a health care liability claim based on negligence, who cannot prove that her injury was proximately caused by the defendant's failure to meet applicable standards of care, does not have a meritorious claim."). Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013). For a negligent act or omission to have been a cause-in-fact of the harm, it must have been a substantial factor in bringing about the harm, and absent the act or omission—i.e., but for the act or omission—the harm would not have occurred. *Id*. If a negligent act or omission "merely creat[es] the condition that makes the harm possible," it is not a substantial factor in causing the harm as a matter of law. *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016). Foreseeability is shown by establishing that "a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission." *Id*. Conjecture, guess, and speculation are insufficient to prove cause-in-fact and foreseeability. *Id*.

To satisfy chapter 74 with respect to proximate causation, the expert need not use any particular words, such as "proximate cause," "foreseeability," or "cause in fact"; however, the expert's explanation of the plaintiff's injuries must be more than a mere conclusory assertion. *Zamarripa*, 526 S.W.3d at 460. The expert must "explain the basis of his statements to link his conclusions to the facts." *Id*.; *Jelinek*, 328 S.W.3d at 539

We review a trial court's decision on the sufficiency of an expert report for abuse of discretion. *Jelinek*, 328 S.W.3d at 539. A court abuses its discretion if it acts in an arbitrary or unreasonable manner and without reference to any guiding rules or principles. *Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 911 (Tex. 2017). In our inquiry, we are

precluded from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *Fulp v. Miller*, 286 S.W.3d 501, 509 (Tex. App.—Corpus Christi 2009, no pet.).

**B.    Supplemental Expert Reports**

In her second report, Spears opined that the nurses at VRMC breached their standard of care on May 15, 2012 by "failing to report labs related to low fibrinogen levels to the physician caring for the patient." Spears noted that "[l]ow fibrinogen levels in patients with placenta accreta can lead to disseminated intravascular coagulation (DIC)." Spears also stated that the nurses breached their standard of care by "not advocating for further investigation of [Flores]'s continued abdominal pain/pressure" and by "allowing [Flores] to be transferred [to] another facility many miles away while she was clearly in [pre-term labor]." Again, pursuant to the statute's restrictions on non-physician experts, Spears did not opine as to causation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C).

Edmondson opined in his report that VRMC nurses breached their standard of care by: (1) failing to "communicate the results of abnormal laboratory tests (blood count, fibrinogen, and bilirubin) to Dr. Ellis and to request additional testing"; (2) failing to "communicate the persistence of [Flores]'s contractions to Dr. Ellis"; (3) failing to "utilize the chain of command when Dr. Ellis decided to transfer a patient who was 32 weeks pregnant with a placenta previa and placenta accreta who was actively contracting and no treatment had been ordered or given"; (4) failing "to provide treatment prior to the transfer to minimize the risk of deterioration of [Flores]'s medical condition and to

7

minimize the risk to her fetus"; and (5) "transferr[ing] an unstable patient nonemergently by ground ambulance to a facility more than 150 miles away."

In a section of his report entitled "Causation," Edmondson stated in part as follows:

[Flores] had two prior cesarean sections and was diagnosed with a placenta previa. The presence of a placenta previa in a patient who has had previous cesarean sections is the most significant risk factor for a morbidly adherent placenta. Dr. Ellis was aware of [Flores]'s cesarean section history and the presence of a placenta previa at least as early as her 22nd week of pregnancy.

. . . .

The VRMC nursing staff, nurses Hedrick and Rivera[,] should have communicated the results of the low hemoglobin and the low fibrinogen levels to Dr. Ellis. They should have requested additional testing such as repeating the blood count and fibrinogen levels, as well as blood tests to assess [Flores]'s clotting. Communication of these results and requests for additional tests would have revealed [Flores]'s concealed bleeding and developing coagulopathy (DIC). These breaches resulted in a failure to diagnose [Flores]'s bleeding and coagulopathy and a failure to appreciate the severity of [Flores]'s medical condition. Nurse Hedrick's and Nurse Rivera's failure to report the lab results and failure to request additional lab tests and Nurse Rivera's failure to communicate the persistent contractions to Dr. Ellis or to convey the presence of persistent contractions without treatment via her chain of command deprived [Flores] of the evaluation and treatment that was necessary to minimize the risk of transfer to her and her fetus. In addition, these breaches deprived Dr. Ellis of information necessary to considering the risks of transfer. With this information, Dr. Ellis would have known that [Flores] was not stable for transfer and that she needed to be delivered, or if she must be transferred, that the transfer should have been emergently to a closer facility, avoiding any undue delay in treatment.

. . . .

Notwithstanding Dr. Ellis's physician certification on the memorandum [of] transfer, VRMC needed to provide treatment to stabilize her medical condition and minimize the risk of transfer; however this obligation of VRMC was not discussed with her prior to her consent. Delivery was a key component of the treatment and was required to stabilize [Flores]'s medical condition. Assuming arguendo that Dr. Ellis was not capable of performing a cesarean hysterectomy on [Flores] and that she must be transferred, an appropriate transfer required treatment to minimize the risk of the transfer such that no material deterioration is likely to occur during the transfer.

8

[Flores] only received IV fluids and IV antibiotics. She did not receive any treatment for her contractions or any evaluation of her anemia or low fibrinogen level. She should have received medication to stop the contractions as well as additional blood tests (repeat blood count to check for a falling hemoglobin and/or platelets, repeat fibrinogen level) and tests of her coagulation (prothrombin time and partial thromboplastin time). Appropriate blood and blood products should have been given. As a result of the failure to provide the necessary treatment prior to transfer her hemorrhaging continues and the coagulopathy continues to evolve, facilitating continued hemorrhage and worsening coagulopathy as described above.

If transfer was necessary, VRMC should have transferred [Flores] emergently to a closer facility. There were hospitals within 50 miles of VRMC with capacity and capability to provide the care that [Flores] needed. More specifically, Doctors Hospital at Renaissance in Edinburg, Texas had a level III NICU, was a level II trauma center (higher level designation than VRMC), and had perinatologists on staff at that facility. The consequence of this breach is that treatment for [Flores]'s·medical condition was delayed. The delay in treatment, as noted above, allowed the hemorrhage to continue, the coagulopathy to evolve facilitating more hemorrhage and shock, and worsening shock leading to end organ damage and cardiovascular collapse.

## C.    Analysis

Citing the Texas Supreme Court's 2017 opinion, VRMC's motion to dismiss argued that the new reports by Edmondson and Spears "still do not explain how [VRMC] allegedly permitted or facilitated Ms. Flores's transfer, or whether [VRMC] had any say in the matter once Dr. Ellis ordered the transfer." Specifically, VRMC contended that, although Edmondson's report suggested that the nurses' failure to provide certain information to Ellis proximately caused Flores's injury and death, it is "pure speculation" to suggest that Ellis was not already aware of that information at the time he ordered the transfer. It also argued that it is "pure speculation" to suggest that, had the nurses "advocated for additional treatment or against transfer (medical decisions they could not lawfully make)," Ellis would have provided additional treatment or transferred Flores to a closer facility.

9

In response to the motion to dismiss, Zamarripa pointed to Edmondson's statement that Ellis "would have known that [Flores] was not stable for transfer" if the nurses had reported the low hemoglobin and low fibrinogen levels to Ellis; his statement that, had the nurses requested additional testing, that testing would have "revealed" Flores's "concealed bleeding and developing coagulopathy"; and his statement that Flores, a patient with placenta previa who had previous cesarean sections, had "the most significant risk factor for a morbidly adherent placenta." Zamarripa argued that these statements satisfy the supreme court's proximate cause requirement.

On appeal, Zamarripa cites the Texas Supreme Court's recent opinion in *Abshire v. Christus Health Southeast Texas*, 563 S.W.3d 219, 221 (Tex. 2018) (per curiam). In that case, the plaintiff Abshire was admitted to the defendant hospital Christus five different times over the course of two weeks, complaining of shortness of breath, difficulty walking, and pain in her chest, back, and shoulders. *Id.* Chest x-rays and physical therapy were ordered. *Id.* But hospital records showed that, for at least two of Abshire's five visits to Christus, the nurses failed to record that Abshire suffers from osteogenesis imperfecta (OI), or brittle-bone disease. *Id.* at 221–22. Subsequently, Abshire was transferred to a different hospital, where a spine MRI was performed, revealing that Abshire had a compression fracture in one of her thoracic vertebrae. *Id.* at 222. Despite surgery, the fracture ultimately rendered Abshire paraplegic and incontinent. *Id.*

Abshire sued Christus, alleging that its nurses were negligent by "fail[ing] to recognize the signs and symptoms of a spinal compression fracture resulting in a delay in treatment" and by "miss[ing] the history of [OI] that predisposes one to fractures." *Id.* She filed an expert report stating in part:

Failure of the nursing staff to document a complete and accurate assessment resulted in a delay in proper medical care (ie. [sic] the ordering of imaging studies and protection of the spine.) . . . . [H]ad the symptomology that Ms. Abshire was experiencing been appropriately linked to the [OI] diagnosis then the proper course of care would have been to admit the patient to the hospital on absolute bed rest, order imaging studies such as a CT or MRI of her back, then treat the injury to the spine. . . . The hospital staff clearly ignored signs and symptoms of spinal injury and kept investigating the same areas over and over with no relief to the patient. . . . This failure on the part of the hospital staff allowed the spinal injury to progress to the point of paraplegia. . . . Had they had a complete medical history they would have known to examine other areas and that this patient had a high probability of a compression fracture.

*Id.* at 224–25.

The Beaumont Court of Appeals found the report insufficient. *HealthSouth Rehab. Hosp. of Beaumont, LLC v. Abshire*, 561 S.W.3d 193, 217 (Tex. App.—Beaumont 2017), *rev'd*, 563 S.W.3d at 219. It observed that, even on the two hospital visits during which Abshire's history of OI was documented by the nurses, the treating physician did not order tests or spinal treatment. *Id.* The report was therefore "conclusory" as to causation because it "fail[ed] to explain how the nurses' alleged failure to document OI was a substantial factor in causing or exacerbating Abshire's injuries . . . or that it would have changed the outcome." *Id.*

The Texas Supreme Court reversed and held that the report was sufficient to satisfy chapter 74 as to causation. *Abshire*, 563 S.W.3d at 225–26. The report "explained how the nurses' breach—failing to consistently document Abshire's OI, particularly in light of her continued complaints of back pain—caused a delay in diagnosis and proper treatment and why that delay caused the issues that led to Abshire's paraplegia." *Id.* at 225. The Court rejected the court of appeals' reasoning, characterizing its analysis as a simple disagreement with the "merits" of the expert's conclusion. *Id.* at 226. The Court noted that, "with respect to causation, the [trial] court's role is to determine whether the

11

expert has explained how the negligent conduct caused the injury." *Id.* "Whether this explanation is believable should be litigated at a later stage of the proceedings." *Id.*

Zamarripa contend that the expert report in *Abshire* is akin to Edmondson's report in this case. They note that, in both cases, the expert explained that the nurses' breaches caused untimely diagnosis and treatment of the patient, which in turn caused the patient's injuries. In *Abshire*, the nurses' breach was their failure to "document and assess," *see* 563 S.W.3d at 227 n.11; here, the nurses' alleged breach was their failure to assess Flores's condition and communicate it to Ellis.

We agree that, under *Abshire*, Edmondson's report is sufficient to establish proximate causation for purposes of chapter 74.[7] The report stated, not as a matter of possibility but as a matter of fact, that the failure of the VRMC nurses to communicate test results and observations to Ellis "deprived Dr. Ellis of information necessary to considering the risks of transfer." According to the report, the information which Ellis was "deprived" of would have made apparent that Flores "was not stable for transfer and that she needed to be delivered, or if she must be transferred, that the transfer should have been emergently to a closer facility." In this way, the report illustrated a direct, causal link from the nurses' breaches of the standard of care to the physician's decision to order the transfer, and in turn, to the fatal outcome in this case.

It is not "pure speculation," as VRMC argues, for Edmondson to suggest that Ellis was unaware of the pertinent information at the time he ordered the transfer; instead, it

---

[7] In its 2017 opinion, the supreme court did not disturb our holding on the sufficiency of the expert reports as to the standard of care applicable to VRMC and its breach thereof. *See Columbia Valley Healthcare Sys. L.P. v. Zamarripa*, 526 S.W.3d 453 (Tex. 2017). Accordingly, we only address whether the reports were sufficient to establish proximate causation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West, Westlaw through 2017 1st C.S.); TEX. R. APP. P. 47.1.

12

was Edmondson's considered expert opinion, the credibility of which is not at issue at this stage of the litigation. *See Abshire,* 563 S.W.3d at 226. Indeed, Edmondson has elucidated the exact causal link that the supreme court envisioned in 2017 when it ordered the trial court to consider granting Zamarripa a 30-day extension to file a compliant report. *See Zamarripa,* 526 S.W.3d at 461 (noting that Spears's first report "seems to suggest that [VRMC] breached its standard of care in not providing Dr. Ellis information that would have persuaded him to change his mind" about the transfer and that, "[w]hile the report does not explain how that could have happened, we cannot say it would be impossible"). It provided a basis for the trial court to conclude that VRMC's nurses had the "means to persuade" the physician to make a different decision regarding the transfer. *See id.*

The causation opinion offered by Edmondson is, in fact, stronger that the one considered in *Abshire*. In *Abshire*, the expert stated that the nurses' failure "to document a complete and accurate assessment" resulted in a delay in care, thereby allowing the plaintiff's "spinal injury to progress to the point of paraplegia." *Id.* at 224–25. But the expert did not state or imply that the treating physicians were unaware that the plaintiff suffered from OI—the condition that made her predisposed to compression fractures. Instead, there was no dispute that, on several occasions, the nurses accurately recorded the plaintiff's condition. *See id.* at 221, 222. The report was nevertheless held to be sufficient as to causation, and not merely the expert's *ipse dixit*, even though there was no further explanation as to why or how a "complete and accurate assessment" would have effectuated a different result. Here, on the other hand, the expert stated directly that the nurses' breaches "deprived" the physician of information that was "necessary" to his decision on whether or not to order a non-emergency transfer. The causal link between

13

the omissions of the hospital staff and the plaintiff's injury has thus been made far more explicit in this case than it was in *Abshire*. VRMC disputes whether Ellis was in fact "deprived" of the necessary information, and a trier of fact may eventually find that he was not, but again, the credibility of Edmondson's opinion is not at issue at this stage. *See Abshire,* 563 S.W.3d at 226.

We conclude that Edmondson's report constitutes a good faith effort to establish the causal relationship between VRMC's alleged breaches and the damages claimed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). Accordingly, we sustain Zamarripa's issue on appeal.

## III. CONCLUSION

Because the supplemental expert reports satisfied the requirements of chapter 74 as to causation under *Abshire*, the trial court abused its discretion by dismissing Zamarripa's claims.[8] We therefore reverse the trial court's judgment as to those claims and remand with instructions to deny VRMC's motion to dismiss and for further proceedings consistent with this opinion.

DORI CONTRERAS
Chief Justice

Delivered and filed the
28th day of February, 2019.

---

[8] We note that the trial court did not have the benefit of *Abshire* at the time it made its ruling. However, as a Texas Supreme Court opinion, *Abshire* is binding, and the trial court has no discretion in determining what the law is or in applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding); *In re K.M.S.*, 91 S.W.3d 331, 331 (Tex. 2002).