COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| EL PASO HEALTHCARE SYSTEM, LTD., D/B/A LAS PALMAS MEDICAL CENTER, | § § § | |
| | § | No. 08-18-00043-CV |
| Appellant, | § | Appeal from the |
| v. | § | County Court at Law Number Three |
| | § | of El Paso County, Texas |
| SANTIAGO MONSIVAIS, DECEASED BY AND THROUGH HIS NEXT FRIENDS, CINTHIA MONSIVAIS AND SAMUEL MONSIVAIS AND CINTHIA MONSIVAIS AND SAMUEL MONSIVAIS, INDIVIDUALLY, | § § § | (TC# 2017DCV1526) |
| | § | |
| Appellees. | | |

## **O P I N I O N**

Group B streptococcus bacteria, while generally harmless to adults, can seriously threaten newborns, the elderly, or otherwise compromised individuals.[1] In this case, a GBS infection apparently took the life of Santiago Monsivais when he was just sixteen-days old. The resulting healthcare liability lawsuit by his parents faulted his pediatrician, an emergency room physician,

---

[1] *See* Centers for Disease Control, "Group B Strep (GBS)" found at https://www.cdc.gov/groupbstrep/index.html (last visited October 18, 2019).

and El Paso Healthcare System, Ltd. which operates Las Palmas Medical Center (Las Palmas). The issue before us in this interlocutory appeal is whether the statutorily required preliminary-expert report filed by Santiago's parents relies on a duty for hospital staff that the law would not recognize. Specifically, Las Palmas contends that the expert report attempts to hold the nurses and staff of the hospital to the same duties that under Texas professional licensing standards, can only be discharged by a medical doctor. While we mostly agree with Las Palmas, one theory of liability survives, and we therefore conclude the trial court did not abuse its discretion in denying Las Palmas's motion to dismiss.

## BACKGROUND

We take the following chronology from the petition and the expert report at issue, noting that none of these factual claims have yet been proven.

### February 4, 2015

Cinthia Monsivais gave birth to Santiago Monsivais on February 4, 2015. Santiago was described as a healthy seven-pound baby boy, whose hospital course was unremarkable. He and his mother were discharged the next day.

### February 10 to 19, 2015

Santiago was followed by pediatrician Dr. Nicolas Rich, who saw the child three times. Dr. Rich first saw Santiago on February 10 for a routine bilirubin and weight check. Other than the mention of mild jaundice, all findings were within normal limits. Santiago was seen again on February 12, 2015, and reported to be sleeping normally, had normal bowel and bladder function, and appeared neither ill nor in any distress. All physical findings were noted within normal limits. Cinthia was instructed to seek further follow-up for Santiago on an as-needed basis.

Following that direction, on February 19 Cinthia took Santiago back to Dr. Rich's office because he was having less frequent bowel movements and trouble breathing. She saw the doctor at 2:39 p.m. His records report that the infant was "afebrile, alert, and vigorous with mild jaundice to appearance."[2] Dr. Rich diagnosed Santiago with mild jaundice, sending mother and child home with instructions to return in one week. From our limited record, Dr. Rich ordered no tests and prescribed no treatments.

## February 20, 2015

At 2:54 a.m. Cinthia took Santiago to the emergency room at Las Palmas. The infant was triaged as a level 3 ("urgent") patient. Cinthia was interviewed at 3:01 a.m. by Michael Bustos, an Emergency Medical Technician-Paramedic. He recorded that Santiago was experiencing constipation with nausea and had two episodes of vomiting in the past five hours. He noted the chief complaint as abdominal pain. At 3:14 a.m. he noted the infant had pain, nausea, constipation that was constant for four to six hours, and had decreased appetite. The child also had had only one wet diaper in the past eight hours. Bustos's physical exam revealed "[b]owel sounds were not present and normal in all four quadrants and at the umbilicus." Santiago did not have a fever on arrival at Las Palmas. At 3:28 a.m. Bustos and Renato Jimenez, a registered nurse, noted that Santiago was lying quietly "with no cry[.]"

Michael C. Payne, MD, the attending emergency department physician, electronically signed Las Palmas's "Emergency Provider Report." That report notes similar findings to those of Paramedic Bustos, except Dr. Payne adds that Santiago was fussy and "crying more." The physical exam portion of Dr. Payne's report states Santiago was well appearing with no irritability. Dr. Payne diagnosed Santiago with infantile colic (uncontrolled crying in a newborn) and discharged

---

[2] As noted, the appellate record is limited to the Plaintiffs' petition and an expert report that summarizes and selectively quotes the medical records.

him from the hospital.  Discharge vitals showed that Santiago's heart rate had increased from 127 to 144 beats per minute.  The mother was counseled on colic in newborns.  According to our record, no tests were run, or treatments administered at Las Palmas.  Santiago was discharged at 3:49 a.m., meaning the entire encounter at Las Palmas lasted 55 minutes.

Cinthia returned home, but Santiago then developed a fever.  She then took Santiago to Providence Memorial Hospital at 6:56 a.m. that same morning.  On admission, he was reported to have a temperature of 104.3 degrees, was in moderate respiratory distress, and tachycardic.  He experienced respiratory arrest at 8:36 a.m.  Efforts to treat him were unsuccessful, and his condition deteriorated until he expired at 10:51 p.m. that same day.  The cause of death was listed as cardiogenic shock from severe sepsis secondary to *Streptococcus agalactiae,* otherwise known as Group B Strep or GBS.

## The Litigation

Cinthia and Samuel Monsivais, individually and on behalf of Santiago, filed a wrongful death suit against Dr. Nicolas Rich, Dr. Michael C. Payne, and Las Palmas.  They originally contended that Las Palmas was vicariously responsible for the conduct of Dr. Payne under a variety of theories, including direct employment, agency, apparent agency, or estoppel.  In a first amended petition, however, the Monsivaises dropped those allegations, and only asserted direct liability claims against Las Palmas.  Specifically, they alleged that Las Palmas personnel "wholly failed to diagnose Santiago's condition, failed to observe him for any meaningful period of time, failed to order any diagnostic studies, failed to appreciate the severity of Santiago's condition at a time when he was septic, and merely discharged him to home."

As required for health care liability claims, the Monsivaises filed a preliminary expert report.  *See* TEX.CIV.PRAC. & REM. CODE ANN. § 74.351.  The report is authored by Dallas

4

Johnson, MD, who is a board-certified Ob-Gyn physician. Las Palmas, Dr. Rich, and Dr. Payne challenged the report, contending in part that Dr. Johnson, an Ob-Gyn physician, never established his qualifications to opine on the standard of care for a pediatrician, an emergency department doctor, or the hospital staff. At a hearing on Dr. Rich and Las Palmas's objections, the trial court sustained the objections, but reconvened the hearing after granting the Monsivaises a thirty-day extension to file a revised report addressing the concerns raised at the hearing.

After the Monsivaises filed a new report, the physician defendants either withdrew or failed to urge any objections. Las Palmas, however, re-urged and refined its objections. It contended in part that Dr. Johnson's preliminary report imposes a higher duty on the hospital staff than is required by law.[3] Las Palmas urged that hospital staff are not licensed in Texas to order tests, diagnose medical conditions, admit patients, or prescribe medications, yet Dr. Johnson's report criticizes Las Palmas personnel for each of those failures. Following a second hearing, however, the trial court overruled Las Palmas's objection in part and declined to dismiss the case.[4] This appeal follows.

## ISSUE ON APPEAL

Dr. Johnson's report begins his criticism of Las Palmas by stating all of its personnel owed a standard of care "to thoroughly, accurately, and completely examine, assess, observe, and treat Santiago." He then elaborated on specific breaches, which we detail below. In this appeal, Las Palmas brings a single issue that argues Dr. Johnson's supplemental report effectively faults Las Palmas and its non-physician staff for breaching a standard of care applicable only to physicians,

---

[3] Las Palmas also challenged Dr. Johnson's qualifications, and claimed the report was conclusory. The trial court expressly rejected the qualification challenge at the hearing which has not been carried forward in this appeal.

[4] Of note, the Monsivaises attempted to revive their vicarious liability theories by filing a second amended petition just prior to the hearing. While it is unclear if the trial court concluded that leave was required under TEX.R.CIV.P. 63, the trial court clearly ruled that the vicarious liability theories were dismissed, and we treat them as such.

such as Dr. Payne, the emergency room physician, and Dr. Rich, Santiago's pediatrician. And Las Palmas urges it cannot be liable for breaching duties that are beyond the scope of its health care employees' practice.

## CONTROLLING LAW

We begin with the familiar standards governing expert medical reports in health care liability claims. The statute requires that within 120 days of when each defendant health care provider files an answer that an "expert report" as to that provider must be served by the plaintiff. TEX.CIV.PRAC.&REM. CODE ANN. § 74.351(a). An "expert report" is statutorily defined as one that "provides a fair summary of the expert's opinions" regarding (1) the standard of care, (2) how the health care provider failed to meet that standard, and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *Id*. at § 74.351(r)(6). An expert report that does not represent a good faith effort to comply with the statute is inadequate, and a trial court must grant a motion challenging an inadequate report. *Id*. at § 74.351(*l*). Or, as here, the trial court may grant one thirty-day extension to allow the plaintiff to file a curative report if elements of the original report are found deficient. *Id*. at § 74.351(c).

The phrase "fair summary of the expert's opinions" means at least that the expert must state more than a mere conclusion. *American Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). Instead, the expert must explain the basis of the opinion so as to link the conclusion to the facts of the case. *Bowie Memorial Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). While claimants need not marshal all their evidence to support the opinion, they must meet the two objectives of the statute: to inform the defendant of the specific conduct claimed to be negligent; and to satisfy the trial court that the claims have merit. *Palacios*, 46 S.W.3d at 877. We look no further than the report itself, because all the information relevant to the inquiry must

be contained within the four corners of the document. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52. Nor should a court have to fill in missing gaps in a report by drawing inferences or resorting to guess work. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *THN Physicians Ass'n v. Tiscareno*, 495 S.W.3d 914, 922 (Tex.App.--El Paso 2016, no pet.). The report must distinctly address each health care defendant's breach of the standard of care and how that breach caused injury. *Clapp v. Perez*, 394 S.W.3d 254, 259 (Tex.App.--El Paso 2012, no pet.). However, a plaintiff does not need file an expert report with respect to each liability theory alleged against the defendant. *See Tenet Hosps. Ltd. v. Bernal*, 482 S.W.3d 165, 171 (Tex.App.--El Paso 2015, no pet.). Instead, an expert report that adequately addresses at least one pleaded theory of liability satisfies the statutory requirements. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013).

## STANDARD OF REVIEW

The trial court makes the decision as to whether the report is sufficient. Our role, whether the trial court has approved or rejected the report, is only to determine if the trial court abused its discretion. *Baty v. Futrell*, 543 S.W.3d 689, 693 (Tex. 2018), *citing Palacios,* 46 S.W.3d at 878; *Tenet Hosps., Ltd. v. Barajas*, 451 S.W.3d 535, 539 (Tex.App.--El Paso 2014, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably and without reference to any guiding rules or principles. *Palacios*, 46 S.W.3d at 877; *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). But simply because we would have decided a matter differently than the trial court does not demonstrate an abuse of discretion. *See Flores v. Fourth Ct. of Appeals*, 777 S.W.2d 38, 41 (Tex. 1989); *Pacheco-Serrant v. Munoz*, 555 S.W.3d 782, 790 (Tex.App.--El Paso 2018, no pet.).

## DISCUSSION

7

"'Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently.'" *Gonzalez v. Padilla*, 485 S.W.3d 236, 248 (Tex.App.--El Paso 2016, no pet.), *quoting Palacios,* 46 S.W.3d at 880; *see also Clapp*, 394 S.W.3d at 259. "'While a "fair summary" is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given.'" *Padilla*, 485 S.W.3d at 248, *quoting Palacios,* 46 S.W.3d at 880. With that in mind, we start with Dr. Johnson's amended report.

## Dissecting the Report

Quoting portions of the expert report, Las Palmas begins its argument by stating the "gist of Dr. Johnson's opinions was: (1) '[t]he standard of care for hospital emergency department personnel is to use all reasonably available information to develop a differential diagnosis for patients who present to it,' and (2) Las Palmas breached that standard of care because it did not do this and 'incorrectly . . . diagnosed Santiago to have infantile colic.'" Las Palmas's need to paraphrase the report is understandable given the report itself. Dr. Johnson begins his critique of Las Palmas by stating "[t]he standard of care was for all [Las Palmas] personnel to thoroughly, accurately, and completely examine, assess, observe, and treat Santiago." What then follows are ten pages of single-spaced text, often formed by multi-page paragraphs, that repeat and restate several specific allegations. At two points, Dr. Johnson attempts to serially list the claimed breaches of the standard of care, but those lists are not entirely consistent.[5] Some allegations are

---

[5] At one point, the report states:

> Within a reasonable degree of medical probability the [Las Palmas's] ED team including Paramedic Bustos, Nurse Jimenez and others failure (1) to properly assess Santiago medical condition, (2) to consider a serious medical condition for Santiago including GBS, (3) to order laboratory blood studies for Santiago, (4) to obtain IV access for hydration and medications for Santiago, (5) to observe Santiago closely for an adequate period of time including admitting him to [Las Palmas]

8

more developed than others, and some are no more than fragments of a complete theory. As best we can tell, Dr. Johnson claims the following breaches of the standard of care for which he provides at least some explanation that the breach caused the infant's death:

(1) the failure to take a thorough and complete medical history (to specifically include the fact that the child had been seen by Dr. Rich some 12 hours earlier and had not improved);

(2) the failure to order diagnostic tests or studies (to include CBC, CRP, gram stain);

(3) the failure to admit Santiago to the hospital for more extended observation;

(4) the failure to properly diagnose Santiago's infection (to include postulating a differential diagnosis, and then to disagree with Dr. Payne's diagnosis based on inconsistencies between the reported findings and the known symptomatology of colic; and

(5) the failure to treat Santiago's infection (to include starting an IV, hydrating the child, and administering antibiotics).

We also identify the following fragmentary theories which are so cursorily explained as to lack a basis as a complete theory:

(1) the failure to take a complete set of vitals at discharge (without any explanation of what those vitals might have showed or explanation of how they might have changed the course of treatment).

(2) the failure to force a consultation or second opinion in the face of Dr. Payne's diagnosis of colic and order to discharge Santiago (without any explanation for how a second opinion might be obtained under hospital policy or obtained any quicker

---

for observation and treatment, (6) to consult with a competent pediatrician and/or an infectious disease specialist for advice on evaluation, diagnosis, and treatment of Santiago, and (7) to administer IV antibiotics such penicillin to Santiago were the proximate cause within a reasonable degree of medical probability of Santiago's suffering and death.

Yet at another point, the Doctor provides a different list for the standard of care:

The standard of care required (1) a thorough and accurate medical history, (2) a physical examination of Santiago with reporting of pertinent findings, (3) laboratory studies to evaluate the infant for otherwise unseen signs to explain his symptoms, (4) development of an assessment and differential diagnosis that used all the information previously obtained to arrive at a reasonable explanation of and (5) treatment (blood work including CBC with differential, CRP, and gram stain, IV, and antibiotics (penicillin), and the administration of IV fluids) [sic] for the condition that brought Santiago to [Las Palmas].

9

than the second opinion from the Providence emergency department at 6:56 a.m. that same morning).

(3) that a nurse's discharge instructions were limited to explaining colic as diagnosed by the doctor (without explaining why a nurse would give discharge instructions for some other condition never diagnosed by the treating physician).

**The alleged failure to diagnose, order tests, admit, and treat Santiago are not actionable**

Las Palmas contends that Dr. Johnson's theories based on diagnosis, ordering tests, admitting the child to the hospital, and administering treatments are beyond the scope of a nurse or EMT's license and cannot be actionable. Based on this record, we agree.

By statute, a person may not "practice medicine" in this state unless the person holds a license issued under the Occupations Code. TEX.OCC.CODE ANN. § 155.001. The term "practicing medicine" is defined as "the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions[.]" TEX.OCC. CODE ANN. § 151.002(a)(13). Physicians practice medicine. *Id.* at § 151.002(a)(12). Nurses, such as Renato Jimenez, do not. "Professional Nursing" has its own definition:

> (2) "Professional nursing" means the performance of an act that requires substantial specialized judgment and skill, the proper performance of which is based on knowledge and application of the principles of biological, physical, and social science as acquired by a completed course in an approved school of professional nursing. The term *does not include acts of medical diagnosis or the prescription of therapeutic or corrective measures*.

TEX.OCC. CODE ANN. § 301.002 (emphasis added). Certainly, professional nursing includes "the observation, assessment, intervention, evaluation, rehabilitation, care and counsel, or health teachings" directed to a patient. *Id.* at § 301.002(2)(A). It might also include "the administration of a medication or treatment *as ordered* by a physician, podiatrist, or dentist[.]" *Id.* at § 301.002(2)(C)(emphasis added). It might also include "the performance of an act delegated by a physician[.]" *Id.* at § 301.002(2)(G).

10

Under these definitions, Nurse Jimenez could neither diagnose Santiago's condition, or initiate any treatment regime, such as antibiotics, without a physician's order. Nor could she admit a patient to the hospital as only a physician with admitting privileges can do so. *See* 25 TEX. ADMIN. CODE § 133.41(f)(6)(B) (2018) (Dept. of State Health Services, Hospital Functions and Services) (noting that "patients are admitted to the hospital *only* by members of the *medical* staff who have been granted admitting privileges[.]")(emphasis added). The Monsivaises respond by citation to a Texas Department of Health publication that states nurses can "diagnose" conditions.[6] Yet a reference in a publication does not trump a statute, and as Las Palmas points out, there is a distinction between a medical diagnosis and a nursing diagnosis. *See Methodist Hosp. v. German*, 369 S.W.3d 333, 341 (Tex.App.--Houston [1st Dist.] 2011, pet. denied) (reciting testimony that a medical diagnosis has to do with the medical condition of the patient while a nursing diagnosis relates to what a nurse can do to intervene and support the medical diagnosis).[7]

---

[6] The Monsivaises do not favor us with a citation to the document. Las Palmas found the document at a website but notes it deals only with State Hospitals. TEX. DEPT. OF STATE HEALTH SERV., Nursing Standards of Care and Nursing Standards of Professional Performance (Rev. ed. 2004), available at https://www.dshs.texas.gov/mhhospitals/Nursing_Standards.pdf). When we visited the website, however, its content had been changed as some of the department's functions had been transferred to another commission. TEX. DEPT. OF STATE HEALTH SERV. "State Hospitals" https://www.dshs.texas.gov/transition/statehospitals.aspx (last visited October 18, 2019). The website no longer provided a link to the document.

[7] *German* cites to the North American Nursing Diagnosis Association (NANDA) that sets standard for acceptable nursing diagnoses and distinguishes a nursing diagnosis from a medical diagnosis thusly:

> A medical diagnosis deals with disease or medical condition. A nursing diagnosis deals with human response to actual or potential health problems and life processes. For example, a medical diagnosis of Cerebrovascular Attack (CVA or Stroke) provides information about the patient's pathology. The complimentary nursing diagnoses of Impaired verbal communication, risk for falls, interrupted family processes and powerlessness provide a more holistic understanding of the impact of that stroke on this particular patient and his family – they also direct nursing interventions to obtain patient-specific outcomes.

Nanda International, "What is the difference between a medical diagnosis and a nursing diagnosis?" kb.nanda.org/article/AA-00266/0/What-is-the-difference-between-a-medical-diagnosis-and-a-nursing-diagnosis-.html (last visited October 21, 2019).

Dr. Johnson also leveled criticism at Javier Bustos, an "Emergency Medical Technician--Paramedic." By statute, an EMT-P must be certified as "minimally proficient to provide *advanced life support* that includes initiation *under medical supervision* of certain procedures, including intravenous therapy, endotracheal or esophageal intubation, electrical cardiac defibrillation or cardioversion, and drug therapy." TEX. HEALTH & SAFETY CODE ANN. § 773.049 (emphasis added). "Advanced life support" is defined as "health care provided to sustain life in an emergency, life-threatening situation." *Id.* at § 773.0496. Nothing in Dr. Johnson's report suggests that Santiago presented at Las Palmas with an emergency life threatening situation that might require intubation, cardiac defibrillation, or the like.

And while Dr. Johnson also refers to Las Palmas's staff as a whole, he never identifies any person who held a professional license to diagnose, order tests, or treat Santiago. A hospital acts only through its agents and employees. As an institution, a hospital is licensed to provide medical care, but it does not practice medicine. *Doctors Hosp. at Renaissance, Ltd. v. Andrade*, 493 S.W.3d 545, 548 (Tex. 2016) (explaining that a hospital is an institution licensed to provide health care, but only a licensed doctor can provide medical care); *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 415 (Tex.App.--Fort Worth 2003, no pet.) ("A hospital cannot practice medicine and therefore cannot be held directly liable for any acts or omissions that constitute medical functions."), *citing Spinks v. Brown*, 103 S.W.3d 452, 456 n.4 (Tex.App.--San Antonio 2002, pet. denied); *German*, 369 S.W.3d at 343 ("Only doctors are legally authorized to make a medical diagnosis by evaluating a patient's medical treatment and the development of subsequent symptoms to conclude that a particular medical condition has resulted.").

Having said that we do not overlook that hospital medical staff might have "standing orders" or "protocols" that they are required to follow that might preauthorize them to conduct

12

specified tests or administer treatments. *See Fortner v. Hosp. of the S.W., LLP*, 399 S.W.3d 373, 381 (Tex.App.--Dallas 2013, no pet.)(noting claimed breaches of standing orders); *Mercy Hosp. of Laredo v. Rios*, 776 S.W.2d 626, 634 (Tex.App.--San Antonio 1989, writ denied)(same); TEX.OCC. CODE ANN. § 157.055 (referring to protocols and other orders directing qualified nurses and physician assistants). The Occupations Code itself allows physicians to delegate authority in certain defined circumstances to other health care providers. TEX.OCC. CODE ANN. § 157.001 ("A physician may delegate to a qualified and properly trained person acting under the physician's supervision any medical act that a reasonable and prudent physician would find within the scope of sound medical judgment to delegate if, in the opinion of the delegating physician [five statutory predicates are met]."). The Occupations Code specifically contemplates delegations to emergency medical personnel certified by the Texas Department of Health. *Id.* at § 157.003. And a person to whom a proper delegation was made is not considered to be practicing medicine without a license. *Id.* at § 157.005. Thus, it would hardly be a surprise for a person presenting at a hospital with complaints of chest pain and shortness of breath to have the staff initiate an immediate ECG before ever seeing a physician. In such a case, the hospital staff has not diagnosed a medical condition such as a heart attack--they have merely followed a directive developed by appropriately licensed and trained practitioners. But Dr. Johnson does not contend either that the Las Palmas medical staff failed to follow any existing protocol, nor that Las Palmas failed in developing appropriate protocols.

We therefore agree that Dr. Johnson's opinions related to the alleged failure of Las Palmas's staff to diagnose, order tests, admit Santiago, or otherwise treat Santiago exceed the scope of the identified staff's licenses, and would not be actionable. But Las Palmas's argument

13

does not ultimately prevail, because we perceive one claim that does fall within the identified medical staff's purview--taking a thorough medical history from the patient.

**Alleged failure to take a complete history**

Dr. Johnson's report made this additional criticism of Las Palmas's staff:

> The medical history was deficient in that it made no mention of the fact Santiago had been seen by a board certified pediatrician less than 12 hours prior to his arrival at [Las Palmas] with no improvement in the same symptoms for which he was seen by that pediatrician. This was a significant error because it established a firm time line for Santiago's symptoms and the fact they were continuing unabated and untreated. This was notice to the [Las Palmas's] ED staff to be on high alert that something was continuing to change this infant's behavior and the standard of care was for [Las Palmas] to make every reasonable effort to determine what that something was and to treat it.

Taking an accurate and complete history from a patient does fall within a nurse's scope of practice. 22 TEX.ADMIN. CODE § 217.11(1)(D) (Board of Nursing Examiners, Standards of Nursing Practice). That history includes "contacts with other health care team members concerning significant events regarding client's status[.] *Id*. at § 217.11(1)(D)(vi). Dr. Johnson's report ascribes some significance to a medical history of twelve to fifteen hours of symptoms with repeated medical encounters, rather than the six to eight hours noted in Javier Bustos's medical history and no mention of a previous medical encounter.

In this regard, a recent case originating from the Ninth Court of Appeals guides us. *HealthSouth Rehab. Hosp. of Beaumont, LLC v. Abshire*, 561 S.W.3d 193 (Tex.App.--Beaumont 2017), *reversed sub nom., Abshire v. Christus Health S.E. Texas*, 563 S.W.3d 219 (Tex. 2018). In *Abshire*, the plaintiff presented at Christus Health's emergency room on four occasions with progressive symptoms of chest pain, difficulty breathing, and joint discomfort. 563 S.W.3d at 221. On two of the admissions, the medical staff made note that the plaintiff had a pre-existing medical condition called *osteogenesis imperfecta* (OI) that predisposed her to fractures. *Id*. On two of the admissions, however, there was no mention of OI in the medical history. *Id*. For each of the

14

admissions, the plaintiff was quickly discharged with no imaging studies of her spine. *Id*. She was then sent to a rehabilitation hospital, HealthSouth Rehabilitation, where she underwent physical therapy. *Id*. at 222. Her condition worsened, and eventually a doctor ordered an MRI of the spine that showed she had a compression fracture of one vertebra. *Id*. The fracture was eventually treated but left her a paraplegic. *Id*. She sued several doctors, as well as Christus Health and HealthSouth. Both these institutions challenged the preliminary expert report.

HealthSouth in part objected because the preliminary expert report faulted its staff for admitting the plaintiff and starting physical therapy as ordered by a doctor. 561 S.W.3d at 205. It claimed, much as Las Palmas does here, that its staff was not licensed to diagnose the plaintiff's OI condition, or the resulting fracture, and could not countermand the physician's order. *Id.* at 210. The Ninth Court of Appeals agreed. *Id.* at 212 ("HealthSouth argues, and we agree, that it cannot be held directly liable for functions that require the practice of medicine."). The court of appeals also found the expert's report was conclusory as to the claims against HealthSouth. *Id.* at 213. The Texas Supreme Court granted the plaintiff's petition for review, but HealthSouth settled their part of the case before the case was argued.[8]

However, the Texas Supreme Court decided the case on the merits for the other defendant, Christus Health. 563 S.W.3d at 221. The expert's primary theory against Christus Health was that its staff had failed to elicit the history of OI on two of the four times she had presented to the emergency department. *Id.* at 224-25. The expert opined that had a doctor known of that history, they would have stabilized the spine to prevent a fracture, or at least ordered imaging studies to

---

[8] The Texas Supreme Court did not set aside the court of appeals' judgment as to HealthSouth, but rather remanded the case to the trial court to effectuate the terms of the settlement. As such, the court of appeals' judgment as to HealthSouth still stands. *See* TEX.R.APP. P. 56.3 ("[T]he Supreme Court's order does not vacate the court of appeals' opinion unless the order specifically provides otherwise."). Accordingly, we consider the limited portion of the court of appeals' opinion addressing whether a hospital staff can practice medicine as persuasive authority.

15

detect the fracture and treat it sooner. *Id*. The court of appeals rejected this theory, concluding there was an "analytical gap" in the opinion that the nurses' failure to chart the plaintiff's history of OI caused her injury, because it did not "explain how the nurses' alleged failure to document OI was a substantial factor in causing or exacerbating Abshire's injuries, or that had such been known then the physicians would have changed the course of treatment, or that it would have changed the outcome." 561 S.W.3d at 217. The court of appeals emphasized that on two occasions, the OI history was noted by the nursing staff but not acted upon by the physicians. *Id*. The Texas Supreme Court disagreed and reversed. First, it held the report made a good-faith effort to explain how proximate cause was to be proven. The report provided "a straightforward link" between the inadequate medical history (failure to document OI), the delay in diagnosis and proper treatment (delay in ordering an MRI), and the ultimate injury (paraplegia). 563 S.W.3d at 225. Next, the Texas Supreme Court concluded that the lower court improperly rejected the expert's causation opinion. *Id*. at 226. The court's job at the preliminary expert report stage "is not to weigh the report's credibility[.]" *Id*.; *see also Miller v. JSC Lake Highlands Operations*, 536 S.W.3d 510, 516 (Tex. 2017) (per curiam) (noting that "[t]he court of appeals' real concern appears to be the *believability* of [the expert's] articulated standards of care, not the manner in which she stated them."). Rather, "the court's role is to determine whether the expert has explained how the negligent conduct caused the injury. Whether this explanation is believable should be litigated at a later stage of the proceedings." 563 S.W.3d at 226.

We could say much the same thing here. Dr. Johnson faulted Las Palmas's staff, in particular EMT-P Bustos and Nurse Jimenez, for recording a six hour, and not a twelve hour history of non-improving symptoms. The history also omitted the visit to another health care provider. While that difference might not appear important to a lay observer, it was to Dr. Johnson

whose credentials and expertise have not been challenged on appeal. He so stated in the portion of his report criticizing Las Palmas. He also articulated this claim at several junctures of the report in addressing the emergency room physician, Dr. Payne:

> The standard of care I observed and practiced when serving as an ER physician was that a reasonably prudent physician should obtain and document a thorough, accurate and complete medical history. In Dr. Payne's circumstance that would include but not be limited to the fact that Santiago was seen by a Board Certified pediatrician 12 hours before presenting to [Las Palmas] for the same complaint and the infant had not improved. Dr. Payne failed to recognize this important fact. This was a significant fact that was not mentioned in his assessment of Santiago. . . .
>
> The record does not indicate Dr. Payne ever considered the fact Santiago had the same complaints for at least 12 hours since being seen by his pediatrician and had not improved.
>
> . . .
>
> In falling below the standard of care and breaching his duty to get a thorough and accurate history including the fact that the child had already been seen for similar complaints less than 12 hours before presenting to Las Palmas Medical Center. . . .
>
> . . .
>
> The fact Santiago was seen so recently for the same complaints and he had not improved should have prompted Dr. Payne to more thoroughly examine the child and, at the very least, examine, observe, and admit him for more than a few minutes, obtain more than one set of vital signs, and include in the differential diagnosis a serious illness including infection.

Reading the report as whole, as we must, Dr. Johnson faults Las Palmas for not eliciting a complete history which, according to Johnson, should have caused Dr. Payne to act differently. Las Palmas urges that an expert report cannot rely on a collective standard of care, and thereby fault a hospital for the failures of physicians who practice there. *See Tenet Hosps. Ltd. v. Love*, 347 S.W.3d 743, 756 (Tex.App.--El Paso 2011, no pet.)(report found deficient for several reasons, including generically criticizing the hospital and physicians for certain failures). We see this report differently. It criticizes both Dr. Payne and two identified Las Palmas staff members for failing to

17

include a specific piece of information that Dr. Johnson claims should have changed the course of care.

For whatever doubts we may have about the merits of this causation opinion, *Abshire* teaches that our role is not to resolve expert causation disputes at this preliminary stage. Rather, those questions are better left for summary judgments, directed verdicts, and if appropriate, by the trier of fact. 563 S.W.3d at 226.

In summary, we are unable to conclude that the trial court abused its discretion in not dismissing the suit based on the arguments raised under Las Palmas's single issue and overrule the same. We affirm the trial court's order denying Appellant's motion to dismiss.


ANN CRAWFORD McCLURE, Chief Justice (Senior Judge)

October 31, 2019

Before Rodriguez, J., McClure, C.J. (Senior Judge), and Larsen, J. (Senior Judge)
McClure, C.J. (Senior Judge), sitting by assignment
Larsen, J. (Senior Judge), sitting by assignment

18